**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| **PAUL GERLICH and ERIN FURLEIGH**, | |
| Plaintiff(s), | No. 4:14-CV-264 |
| vs. | **PLAINTIFFS' RESISTANCE TO DEFENDANTS' MOTION TO DISMISS** |
| **STEVEN LEATH, WARREN MADDEN, THOMAS HILL, and LEESHA ZIMMERMAN**, | |
| Defendant(s). | (Oral Argument Requested) |

Plaintiffs Paul Gerlich and Erin Furleigh resist Defendants' Motion to Dismiss and request that the Motion be denied in its entirety. Plaintiffs base their Resistance on the authority presented below – their Complaint, when read in its entirety and accepting its factual allegations as true, states a claim upon which relief can be granted against each and every Defendant. Because oral argument on this Resistance will assist the Court and the parties in considering the constitutional issues presented, Plaintiffs seek the opportunity to be heard orally, and good cause thereby is presented for this request.

**TABLE OF CONTENTS**

I.   INTRODUCTION ..................................................................................................................2
II.  BACKGROUND ....................................................................................................................4
III. ARGUMENT..........................................................................................................................7
    A.   The Defendants Have Implemented a Regime of Unconstitutional
        Viewpoint Discrimination in Violation of the First Amendment ..........................8
        1.   The Motion to Dismiss Does Not Address the Central Allegations
            of the Complaint ........................................................................................8
        2.   Defendants Cannot Shield Illegitimate Restrictions on Political
            Speech by Invoking Trademark Principles ..............................................10
    B.   Defendants Are Not Entitled to Qualified Immunity............................................16
    C.   Defendants' Sovereign Immunity Argument Lacks Merit ...................................18

1

     D.      Exhaustion Is Not Required Under Section 1983 .................................................19

IV.    CONCLUSION.................................................................................................................20

## I. INTRODUCTION

Defendants' primary argument supporting their Motion to Dismiss – that no valid First Amendment claim may arise from their denial of the ability to use Iowa State University ("ISU") trademarks – simply misses the point. Defendants violated the basic constitutional rule that government officials cannot deny a benefit to a group or otherwise restrict its message out of hostility to the group or disagreement with its speech. *Healy v. James*, 408 U.S. 169, 185-86 (1972) (the government cannot "deny[] rights and privileges solely because of a citizen's association with an unpopular organization"). This rule is so well-established that it does not matter how the government achieves the prohibited content- or viewpoint-based discrimination. It is a basic constitutional precept that government officials "'may not deny a benefit to a person on a basis that infringes his … freedom of speech *even if he has no entitlement to that benefit*.'" *Agency for Intern. Dev. v. Alliance for Open Soc'y Intern., Inc.*, 133 S. Ct. 2321, 2328 (2013) (emphasis added) (quoting *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006)); *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). "The government may not regulate [expression] based on hostility – or favoritism – towards the underlying message expressed" even where speech is *entirely unprotected* by the First Amendment. *R.A.V. v. of St. Paul, Minn.*, 505 U.S. 377, 386 (1992) (for example, "the government may proscribe libel; but it may not make the further content discrimination of pro-scribing *only* libel critical of the government").

Yet that is precisely what happened in this case. As the Complaint sets forth in detail, the Defendants took steps to restrict expression by the ISU chapter of the National Organization for the Reform of Marijuana Laws ("NORML"), including limits on apparel bearing the group's

2

drug-law reform message, after state officials complained about a news story that described ISU NORML's activities. Compl. ¶¶ 31-35. ISU officials summarily replaced the group's faculty advisor, *id*. ¶¶ 36-38, and rescinded prior approval of a t-shirt design that had drawn the state officials' ire. *Id*. ¶¶ 32-34. Defendants then adopted and enforced new University trademark regulations expressly to restrict NORML ISU's message. *Id*. ¶¶ 39-41. Applying those new regulations, the Defendants rejected two additional NORML ISU t-shirt designs, including one that stated "NORML ISU Supports Marijuana Legalization." *Id*. ¶¶ 47-58.

Accordingly, this is not, as Defendants try to frame it, simply a "case about Plaintiffs' desire to use Iowa State University trademarks." Motion at 3. It is, instead, a case where university officials caved to political pressure out of embarrassment and a desire to restrict or control a student group's political message. Compl. ¶¶ 31-35. The fact that Defendants used ISU's trademark approval process as one means to accomplish this illegitimate purpose cannot immunize them from a First Amendment claim. *See*, *e.g*., *Hague v. Committee for Indus. Org.*, 307 U.S. 496, 516 (1939) (otherwise valid regulation violates the First Amendment where it can "be made the instrument of arbitrary suppression of free expression of views on national affairs").

Even if this were a traditional trademark case – which it is not – numerous decisions make clear that trademarks cannot be "transformed from rights against unfair competition to rights to control language." *CPC Int'l, Inc. v. Skippy, Inc.*, 214 F.3d 456, 462 (4th Cir. 2000). To forestall the possibility that "overextension of Lanham Act restrictions … might intrude on First Amendment values," courts have construed the Act narrowly. *E.g*., *Rogers v. Grimaldi*, 875 F.2d 994, 998 (2d Cir. 1989). Most importantly for purposes of this Motion, a university cannot foreclose First Amendment claims simply by crying "trademark." In cases like this, courts have held that First Amendment interests outweigh the possibility of confusion in the use

3

of university trademarks. *See University of Ala. Bd. of Trustees v. New Life Art, Inc.*, 683 F.3d 1266, 1276-78 (11th Cir. 2012). The same constitutional considerations apply in this case.

## II. BACKGROUND

Plaintiffs are members of an approved campus organization affiliated with NORML. Compl. ¶¶ 2, 5, 21-22. Among other political activities, NORML ISU seeks to promote a better understanding of laws concerning cannabis in the state of Iowa and in the United States at large. To further this goal, NORML ISU produces t-shirts with messages designed to raise awareness of the group and its efforts. *Id.* ¶ 22. However, university guidelines (and design standards) require NORML ISU to obtain prior approval from the ISU Trademark Office before it can make the shirts. *Id*. ¶¶ 25-26. Seeking university approval is not optional if NORML ISU wants to produce *any* item that includes the name of the organization. [1]

In November 2012, a lengthy front-page article in the *Des Moines Register* on efforts to legalize marijuana discussed efforts by NORML ISU to collect signatures for petitions advocating drug policy reform. The article included a photograph of the then-student president of NORML ISU wearing a t-shirt that had been approved by the Trademark office. [2] The shirt had the name of the organization on the front, with the "O" in "NORML" represented by the head of

---

[1] The Guidelines for University Trademark Use by Student and Campus Organizations require that "[t]he recognized name of the organization *must* appear in the design." Compl. Ex. A at 5 (emphasis added). Plaintiffs therefore must request approval under the guidelines for use of its own "NORML ISU" club name because the "recognized name of the organization" includes "ISU." *See* https://sodb-stuorg.sws.iastate.edu/view-details.php?id=1954.

[2] Compl. ¶¶ 29, 31. In the article, chapter president Josh Montgomery noted that the organization was trying to get 600,000 signatures and that NORML ISU "has gotten nothing but support from the university." *See* Sharyn Jackson, *Legalized Marijuana: Is Iowa Next?* Des Moines Register, Nov. 19, 2012 (attached as Ex. 1). Montgomery added that ISU had also approved the t-shirt at issue.

ISU mascot "Cy the Cardinal." Compl. ¶ 8. The text on the back of the shirt read, "Freedom is NORML at ISU" with an image of a small cannabis leaf above the acronym "NORML."

The news story prompted an immediate adverse reaction. State legislators and private citizens complained to ISU that its mascot had been used on a shirt promoting legalization of marijuana. *Id.* ¶ 34; Ex. B, *ISU Student Group Banned From Producing More Shirts Using Cy Logo*, DES MOINES REGISTER, Nov. 30, 2012. Fearing this reaction to the perceived political message might cause a loss of state funding or of alumni donations, Defendants Thomas Hill and Warren Madden summoned representatives of NORML ISU to a meeting. Compl. ¶¶ 32, 35. There, Defendants Hill and Madden announced that ISU had rescinded approval of NORML ISU's t-shirt design and that its advisor, James Wilson, had been removed.[3] Following these events, the ISU Trademark Office revised its Trademark Guidelines specifically to address the situation with NORML ISU, adding a new Section 6(e):

> No designs that use University marks that suggest promotion of the below listed items will be approved: dangerous, illegal or unhealthy products, action, or behaviors …. [D]rugs and drug paraphernalia that are illegal or unhealthful ….

Compl. ¶ 39; Ex. A.

In February 2013, NORML ISU invited Steven Lukan, Director of the Iowa Office of Drug Control Policy, to an event on campus. In the invitation, NORML ISU member Montgomery encouraged the Director to attend, adding that the group had a new t-shirt design. Compl. ¶ 42. In response, Lukan complained to Defendant ISU President Steven Leath that NORML ISU members were still being permitted to advocate marijuana legalization using ISU

---

[3] Compl. ¶¶ 32, 36. Because ISU policies require student organizations to have a faculty advisor, Defendant Hill stepped in as NORML ISU's "interim advisor." *Id.* ¶ 37. However, Defendant Hill has not relinquished this "temporary" role overseeing NORMAL ISU's activities even though ISU psychology professor Eric Cooper became the organization's permanent faculty advisor in February 2013. *Id.* ¶ 38.

trademarks. *Id.* ¶ 43. This in turn prompted Leath to direct Defendant Hill to address the situation involving the t-shirt designs. *Id.* ¶ 44. Defendant Hill then met with the group to admonish them on behalf of ISU and its President as Leath had directed. *Id.* ¶ 45.

Following these events, and in applying the new guidelines, the ISU Trademark Office approved some proposed t-shirt designs but rejected others.[4] In June 2013 the ISU Trademark Office rejected a t-shirt design with the slogan "NORML ISU Supports Legalizing Marijuana" with a cannabis leaf graphic on the front. Compl. ¶ 48. The back of the t-shirt spelled out the name of the organization: National Organization for the Reform of Marijuana Laws. *Id*. Defendant Leesha Zimmerman explained that the design was rejected not because of the new guideline's prohibition on messages that purportedly promote illegal or unhealthy behaviors, but because of its political content.

Specifically, Defendant Zimmerman told NORML ISU's faculty advisor Cooper that she rejected the t-shirt design because:

> T-shirts are like walking billboards to advertise many things. It can be an opportunity or failure. You have suggested a T-shirt [sic] design with the organization name and the statement 'Legalize Marijuana' with a graphic cannabis leaf. 'Legalize Marijuana' is a call to action but it does not suggest any specific way your organization is making that happen.

*Id.* ¶ 50. She also claimed that "[i]t can easily be inferred by the general public that the students attending Iowa State University want to legalize marijuana for their use and by default, the university must support the effort." *Id*. Defendant Zimmerman further asserted the design had "a certain shock or attention grabbing sensationalism," and that the shirts "do not further your

---

[4] The Trademark Office approved a design that said "NORML ISU" across the front and "We are NORML" across the back, and another design on April 15, 2013, that stated "NORML ISU Student Chapter" on the front. Compl. ¶ 47.

cause as an advocate for change in the laws or trying to change the publics' [sic] perception of marijuana." *Id.* ¶ 51.

In April 2014, the Trademark Office rejected another proposed design, this time claiming the design violated ISU's prohibition against promoting "dangerous, illegal or unhealthy products, actions or behaviors" and "drugs and drug paraphernalia that are illegal or unhealthful." *Id.* ¶ 55. This t-shirt design repeated the phrase "NORML ISU" but varied the ink color to create the outline of a cannabis leaf. *Id*. ¶ 54 & Ex. C.

On March 11, 2014, the Foundation for Individual Rights in Education ("FIRE"), a non-partisan, non-profit, civil rights organization that protects rights of free expression on college and university campuses, notified President Leath by letter that ISU's application of its Trademark Licensing Policy to NORML ISU violated the First Amendment. Compl. ¶ 57. ISU disagreed that the policy or its enforcement violated the First Amendment. *Id*. ¶ 58.

### III.     ARGUMENT

The legal standard governing motions to dismiss is daunting. The Court must assume all facts alleged in the Complaint are true, and must construe it liberally in the light most favorable to Plaintiffs. *Coleman v. Watt*, 40 F.3d 255, 258 (8th Cir. 1994); *Fusco v. Xerox Corp.,* 676 F.2d 332, 334 (8th Cir.1982). A Rule 12(b)(6) motion to dismiss must be denied unless it appears beyond doubt that plaintiff can prove no set of facts which would entitle the plaintiff to relief. *Morton v. Becker,* 793 F.2d 185, 187 (8th Cir.1986). While "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (internal quotations and citation omitted), this means only that plaintiff's allegations must be sufficient to "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Cole v. Homier Distrib. Co., Inc.*, 599 F.3d 856, 861 (8th Cir. 2010). Courts must assess the plausibility of each claim with

reference to the plaintiff's allegations as a whole, not in terms of the plausibility of each individual allegation. *Zoltek Corp. v. Structural Polymer Grp.*, 592 F.3d 893, 896 n. 4 (8th Cir. 2010) (internal citation omitted). This inquiry is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." [5] Defendants here come nowhere close to meeting this standard.

> **A.     The Defendants Have Implemented a Regime of Unconstitutional Viewpoint Discrimination in Violation of the First Amendment**
>
> **1.     The Motion to Dismiss Does Not Address the Central Allegations of the Complaint**

Defendants' Motion to Dismiss is premised on fundamental confusion about the nature of this case. This is not a Lanham Act case in which ISU is seeking to enforce its trademark rights against someone who has commercially exploited them. Nor is it even a declaratory ruling action to determine whether ISU holds enforceable rights under the Lanham Act. For that reason, Defendants' arguments that Plaintiffs "failed to plead" that the proposed use of ISU's marks is a fair use, that such use does not create confusion, or that no alternative avenues of communication exist, are inapplicable. Motion at 3-4.

Even if this were a traditional trademark case, the Supreme Court has made clear the burden is on the party charging infringement "even when relying on an incontestable registration." [6] But this is not such a case, as the Complaint makes clear. This is a civil rights claim

---

[5] *Iqbal*, 556 U.S. at 664. In assessing "plausibility," courts may "consider materials outside the pleadings, such as materials that are necessarily embraced by the pleadings and exhibits attached to the complaint." *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003) (citing *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999)).

[6] *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 118 (2004). Thus, if this were a traditional trademark case it is far from clear ISU could legitimately bar NORML ISU from producing the t-shirts at issue here. First, nominative uses of a trademark, *i.e.*, use of a mark to identify or refer to the mark holder's product, are protected and do not give rise to any cause of action under trademark laws. *See New Kids on the Block v. News Am.*

under the First and Fourteenth Amendments to challenge viewpoint-based discrimination imposed on NORML ISU as a backlash against the organization's political positions.

The adverse actions began after publication of the *Des Moines Register* article discussing marijuana legalization generally, which included efforts of NORML ISU to gather petition signatures, and a photo of a NORML ISU t-shirt. This was the catalyst for a series of adverse actions that included: (1) rescinding approval of the t-shirt design pictured in the article, Compl. ¶¶ 32-35, 64; (2) removing NORML ISU's faculty advisor and replacing him with Defendant Hill, *id*. ¶¶ 36-38, 66; (3) adopting vague and overbroad new Trademark Guidelines targeting NORML ISU's expression *id*. ¶¶ 39-41, 71-89; and (4) applying the guidelines arbitrarily (and inconsistently) to restrict NORML ISU's political message. *Id*. ¶¶ 47-58, 65. Each of these actions targeted NORML ISU's expression based on disagreement with its message.

Far from being a typical trademark case, the Complaint alleges three counts of constitutional violations – which Defendants' Motion ignores entirely. *Id*. ¶¶ 59-89. The fact that some of the violations were accomplished by Defendants' manipulation of ISU Trademark Guidelines cannot insulate them from constitutional scrutiny. Defendants thus miss the point entirely by arguing Plaintiffs "fail to demonstrate a fundamental right to use ISU's trademark." Motion at 4.

Regardless of whether any such "right" exists, it is undeniable that viewpoint discrimination is "an egregious form of content discrimination," *Rosenberger*, 515 U.S. at 829, and

---

*Publ'ns*, 971 F.2d 302 (9th Cir. 1992). Second, NORML ISU is not engaging in a commercial endeavor. Citing *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 779 (8th Cir. 2004), and *Coca-Cola Co. v. Purdy*, 2005 WL 212797, at *3 (D. Minn. Jan. 28, 2005), Defendants argue that marks cannot be used in "bad faith to promote message, generate publicity, and raise money for a cause." Motion at 4-5. However, Plaintiffs' t-shirts here were not part of a campaign to raise money for NORML ISU – they were deliberately used by the student group to spread awareness about its political message. Even if NORML ISU profited in some small way from the sale of their shirts, speech is not commercial "simply because it concerns economic subjects or is sold for a profit." *Taucher v. Born*, 53 F.Supp.2d 464, 480 (D.D.C. 1999).

a university, "acting here as the instrumentality of the State, may not restrict speech or association simply because it finds the views expressed by the group to be abhorrent." *Healy*, 408 U.S. at 187-88. The Eighth Circuit applied these foundational principles when it held the University of Arkansas violated the First Amendment by denying discretionary funding to an organization of gay students. *Gay & Lesbian Students Ass'n v. Gohn*, 850 F.2d 361 (8th Cir. 1988). The court acknowledged the "group ha[d] no right to funding" for its expressive activities, but held that "when funds are made available, they must be distributed in a viewpoint neutral manner." *Id*. at 366.

The parallels between this case and *Gohn* are striking. The *Gohn* court noted that the prospect of funding a gay student organization was controversial and that "[e]vents on campus did not escape the notice of University officials or state legislators" who "were concerned about the adverse publicity that funding the [gay group] had brought." *Id*. at 364. As here, "University officials were feeling pressure from state legislators not to fund" the gay organization, and one of the arguments made was that "sodomy is illegal in Arkansas." *Id*. at 367-368. The court noted the group did not advocate sodomy (which, at the time violated Arkansas law), but "even if it did, its speech about an illegal activity would still be protected by the First Amendment." Thus, even if there was no "right" to funding, the Eighth Circuit held "the government may not discriminate against people because it dislikes their ideas, not even when the ideas include advocating that certain conduct now criminal be legalized." *Id*. at 368. The same is true of ISU NORML's use of university marks, which ISU policies in any event *require* Plaintiffs to use. *See supra* 4.

    **2.**    **Defendants Cannot Shield Illegitimate Restrictions on Political Speech by Invoking Trademark Principles**

Defendants' citation of a few generic trademark cases and their unhelpful statement that "[t]rademarks are property," Motion at 3, say nothing about the issues raised in *this* case. *Of*

10

*course* trademarks are a form of intellectual property, but numerous courts have cautioned that the enforcement of such rights must be tempered by First Amendment concerns. *Cliff Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp., Inc.*, 886 F.2d 490, 495-96 (2d Cir. 1989); *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1099-01 (9th Cir. 2008); *ETW Corp. v. Jireh Publ'g Inc.,* 332 F.3d 915, 918-919 (6th Cir. 2003). Rights granted under trademark law are more limited than those provided by copyright or patent law, *Anheuser-Busch, Inc. v. Balducci Publ'ns*, 28 F.3d 769, 777 (8th Cir. 1994), and "in deciding the reach of the Lanham Act in any case where an expressive work is alleged to infringe a trademark, it is appropriate to weigh the public interest in free expression against the public interest in avoiding consumer confusion." *Cliffs Notes,* 886 F.2d at 494. *See New Life Art, Inc.*, 683 F.3d at 1278 (because of First Amendment concerns "we should construe the Lanham Act narrowly").

Defendants cannot suggest that the existence of intellectual property rights empowers a state university to approve the use of school-held trademarks only by groups it favors, and to deny such use by those it dislikes. The university could not, for example, allow use of the ISU mark only by the college Republicans while denying it to the college Democrats (or vice versa), and none of the *dicta* that Defendants cite about "alternative channels of communication" or "likelihood of confusion" could ever legitimize such an abuse of power. *See*, *e.g.*, *Cox v. Louisiana*, 379 U.S. 536, 581 (1965) (Black, J., concurring) (viewpoint-based regulation is "censorship in its most odious form").

Tellingly, none of the cases Defendants cite address the application of trademark law in the university context, much less in the situation presented here – where the university by regulation asserts blanket control over the use of the school name, and by extension the name of affected organizations (*e.g*., NORML ISU). In this context, Defendants' citation of *Mutual of*

*Omaha Ins. Co. v. Novak*, 836 F.2d 397 (8th Cir. 1987), for the proposition that trademarks "do not yield to free speech rights when adequate alternative avenues of communication exist," Motion at 3, is entirely inapplicable. *Novak* was expressly limited to the circumstances of that case, *id*. at 402, which was a far cry from the situation here, where school organizations must get their designs and messages approved by the university if their names include "ISU," or they plan to incorporate other school marks. Here, there is no "alternative channel" – NORML ISU *must* submit to the university's approval process if it wants to put its name on a t-shirt, or on any other item. This process is one of the ways Defendants have exerted illegitimate control over NORML ISU's political speech.

This specialized context of trademark enforcement also undermines Defendants' claim that they are simply trying to avoid "consumer confusion," which is an important purpose of trademark law. Motion at 4-5. Courts routinely reject efforts by public schools and universities to restrict student expression based on the argument that the citizenry may confuse permitting such speech as official endorsement of the expression. *Rosenberger*, 515 U.S. at 841 (attribution concern "not a plausible fear"). *See Forum for Academic & Inst. Rights,* 547 U.S. at 65. Particularly where all campus organizations must seek approval through the Trademark Office, as is required here, it is fanciful to suggest that granting use of university trademarks implies agreement with political positions of various student or university groups. *Cf. Knights of Ku Klux Klan v. Arkansas State Highway & Transp. Dep't*, 807 F. Supp. 1427, 1438 (W.D. Arkansas 1992) (Allowing participation in the "Adopt-a-Highway" program "is no more an indication of support for the Klan and its racist and other policies of intolerance than participation in the program by NORML and the placing of the sign for that organization indicates that the Arkansas Highway and Transportation Department advocates the legalization of marijuana.").

As a factual matter, Defendants cannot seriously suggest that their actions are just about NORML ISU's t-shirts.  Although they have asserted that they took various actions because of adverse reaction to a photo of a NORML ISU t-shirt in a news story about marijuana legalization efforts, that article included a statement from NORML ISU's then president that he was engaged in a massive petition drive, and that he had gotten "nothing but support from the university."  Ex. 1 at 3.  The article also mentioned (and pictured) the shirt that previously had been approved by the Trademark Office, but it is by no means clear the political reaction and subsequent pressure on university officials was limited to the apparel.  To the extent any purported "confusion" about the university's position on marijuana legalization was based on the description of NORML ISU's political activities, the adverse treatment of the organization violated the First Amendment.  *E.g.*, *Street v. New York*, 394 U.S. 576, 589 (1969).

In any event, Defendants' claim that they took actions only to avoid any misimpression about the university's position on drug policy is impossible to believe under the circumstances.[7]  The Defendants summarily removed NORML ISU's faculty advisor after the news article appeared and replaced him with Defendant Hill.  This adverse action was entirely independent of any feigned trademark concerns, represents a separate constitutional violation, and undermines entirely ISU's rationalizations.

If the university actually had concerns that members of the public might perceive institutional support for NORML ISU's political objectives, it would not have made its Senior Vice President for Student Affairs the group's faculty advisor.  But Defendant Hill has continued as NORML ISU's "interim" advisor, long after the organization obtained a new faculty advisor,

---

[7] If the university harbored any actual concerns in this regard, it has myriad ways to make its position known.  *Cf*. *Forum for Academic & Institutional Rights,* 547 U.S. at 60 ("schools remain free … to express whatever views they may have").

and has functioned mainly to monitor the group's activities, implement the new restrictive trademark policies, and convey criticism to the group from President Leath.  Not only do these actions refute Defendants' assertion that the university is merely trying to avoid the appearance of entanglement with NORML ISU, they are constitutionally suspect in themselves.  *E.g.*, *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1268-69 (11th Cir. 2004) ("verbal censure" from a school official "cannot help but have a tremendous chilling effect on the exercise of First Amendment rights").

ISU's claims about "confusion" are entirely implausible, and the actions it has taken under the trademark policy do nothing to address this issue.  ISU has rejected those designs that drew complaints from government officials, focusing on those that contained slogans promoting the group and its political message (*e.g*., "Freedom is NORML at ISU," "NORML ISU Supports Legalizing Marijuana), or that used imagery of a cannabis leaf.  Compl. ¶¶ 28, 33-35, 48, 54-55.  Nothing in these designs suggests anything about the University's position.  Although Defendant Zimmerman claimed people might infer that student support for marijuana legalization necessarily implies "the university must support that effort," she frankly expressed her actual concerns in rejecting one of the designs:  she thought it represented a "call to action," that it had "a certain shock or attention grabbing sensationalism," and that the design does "not further your cause as an advocate for change in the laws or trying to change the publics' [sic] perception of marijuana."  *Id*. ¶¶ 50-51.  Such justifications have nothing at all to do with "confusion," and instead reveal Defendants' interest in restricting political speech.

Nor is it possible to take seriously Defendants' claim that their new trademark guidelines were adopted not to suppress NORML ISU's expressive activities, but to avoid linking ISU with "dangerous, illegal or unhealthy products, actions, or behaviors."  The Trademark Office

14

approved a design by the skeet shooting team depicting Cy the Cardinal holding a musket, *see* Complaint Ex. B, despite the fact that there are more than 11,000 gun-related homicides annually in the United States. *See* http://www.cdc.gov/nchs/fastats/ homicide.htm. It allows (and even encourages) ISU marks to be used on football helmets and apparel even though football is linked to significant numbers of brain injuries. *See* Ken Belson, *Brain Trauma to Affect One in Three Players, N.F.L. Agrees*, NEW YORK TIMES, September 12, 2014. And ISU logos are plastered on beer mugs and shot glasses, *e.g.*, www.amazon.com/Licensed-Iowa-State-University-Glass/ dp/B00GMAO3A0/ref=sr, notwithstanding the number of college students harmed every year by binge drinking. *See* http://www.niaaa.nih.gov/alcohol-health/special-populations-co-occurring-disorders/college-drinking ("1,825 college students between the ages of 18 and 24 die each year from alcohol-related unintentional injuries"). *See also* Compl. ¶ 86 (describing Trademark Office approval for use of university marks by ISU Cuffs, the organization promoting alternative sexual practices, including bondage).

Given the many items the Trademark Office approves, Defendants' claim that allowing the depiction of a marijuana leaf on NORML ISU t-shirts will somehow "promote" dangerous or illegal behavior is not just wrong – it is ridiculous. *See Gohn*, 850 F.2d at 368 (funding gay student organization "does not advocate sodomy").

ISU gains nothing from its argument that it did not reject every design proposed by NORML ISU. The government need not burn every book in the library to be considered a censor – it just takes one. *E.g.*, *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 812 (2000) ("The distinction between laws burdening and laws banning speech is but a matter of degree."). Nor does it help Defendants that they offered to "help" NORML ISU find designs the government finds acceptable. "If there is any fixed star in our constitutional constellation, it is

that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). In this case, the ISU Defendants' constitutional violations are glaringly obvious.

### B. Defendants Are Not Entitled to Qualified Immunity

Defendants' plea for this Court to dismiss all claims for actions "in their individual capacities" provides no basis to dismiss this case even if their qualified immunity arguments were sound. Motion at 6-10. This is because qualified immunity does not preclude suits seeking declaratory or injunctive relief from defendants in their official capacities. *Burnham v. Ianni*, 119 F.3d 668, 673 n.7 (8th Cir. 1997) (*en banc*); *D'Aguanno v. Gallagher*, 50 F.3d 877 (11th Cir. 1995). *Cf. New York City Health & Hosps. Corp. v. Perales*, 50 F.3d 129, 135 (2d Cir. 1995) (qualified immunity does not protect against claims for attorney's fees or fines ancillary to prospective relief). Thus, even if the individual capacity claims were dismissed, this case would continue.

Defendants' arguments for applying qualified immunity in this case are fatally flawed on the merits as well. Qualified immunity must be denied where (1) facts set forth by the plaintiff make out a violation of a constitutional or statutory right, that (2) was clearly established at the time of the misconduct. *Burton v. St. Louis Bd. of Police Comm'rs*, 731 F.3d 784, 791 (8th Cir. 2013); *Winslow v. Smith*, 696 F.3d 716, 730 (8th Cir. 2012); *accord Pearson v. Callahan*, 555 U.S. 223, 232 (2009). In this case, both criteria clearly are satisfied.

It has long been established that a state university president and lower level administrators cannot deny recognition or other benefits to a student group because of concern about the organization's political goals. *Healy*, 408 U.S. at 187-88. Nor may university officials engage in such viewpoint discrimination by claiming concern that others may equate the views of students with the state's official position, *Rosenberger*, 515 U.S. at 841, or by asserting that students are

16

advocating illegal behavior. *Gohn*, 850 F.2d at 368. It has been the law for many decades that the government may not deny a benefit based on a person's constitutionally-protected speech or associations, even if the person had no "right" to the benefit in the first place. *Speiser v. Randall*, 357 U.S. 513, 526 (1958). No competent college administrator could be ignorant of these basic principles. *Burnham*, 119 F.3d at 74-77 (denying qualified immunity to university chancellor based on well-established principle that the First Amendment "prevents the government from proscribing speech of any kind simply because of disapproval of the ideas expressed").

Defendants cannot escape these constitutional requirements simply because they achieved some of their objectives by manipulating their school's trademark policy. Thus, their argument that the Complaint "fails to identify a case where university officials violated the free speech rights of student organization members by denying them a particular use of the university's trademark," Motion at 7, misstates the issue. Moreover, Plaintiffs are not required to cite all factually and legally analogous cases to satisfy the requirements of Fed. R. Civ. P. 8. The relevant pleading standard examines whether a complaint contains "sufficient *factual* matter . . . to state a claim for relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (citation omitted and emphasis added). The existence of a "clearly established" constitutional right is a question of law for the court to decide. *Bishop v. Glazier*, 723 F.3d 957, 961 (8th Cir. 2013) (citing *Rohrbough v. Hall*, 586 F.3d 582, 586 (8th Cir. 2009)).

Even if the particular action in question has not previously been held unlawful, "[a] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Shekleton v. Eichenberger*, 677 F.3d 361, 367 (8th Cir. 2012) (internal editing omitted). *See Glik v. Cunniffe*, 655 F.3d 78, 85 (1st Cir. 2011). Thus, "the unlawfulness must merely be apparent in light of preexisting law, and officials can still be

17

on notice that their conduct violates established law even in novel factual circumstances." *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 531 (8th Cir. 2009) (*en banc*) (internal citation and quotation marks omitted).  In this case, there was ample precedent that Defendants were acting in violation of well-established principles of constitutional law.  *Gohn*, 850 F.2d at 367-368.  *See also* Compl. ¶ 57 (Defendants were put on notice of controlling constitutional principles).

Likewise, Defendants' argument that individual capacity claims against President Leath should be dismissed based on qualified immunity is erroneous.  Motion 9-10.  Contrary to the premise of this argument, liability is not predicated on a *respondeat superior* theory of supervisory responsibility, but on Defendant's Leath's direct actions.  *See* Compl. ¶¶ 43-44, 57.  In this regard, it is well-established that a university president cannot hide behind qualified immunity when he participates in retaliatory acts in response to student speech.  *E.g.*, *Barnes v. Zaccari*, 669 F.3d 1295, 1103-06 (11th Cir. 2012).  *See Holloman*, 370 F.3d at 1279-82.

### C. Defendants' Sovereign Immunity Argument Lacks Merit

Defendants also cannot escape liability on the basis of sovereign immunity.  Defendants Madden and Zimmerman are sued in both their individual and official capacities.  Accordingly, no Eleventh Amendment immunity applies to Plaintiffs' request for damages in Count I of the Complaint.  *See*, *e.g.*, *Thomas v. Gunter*, 32 F.3d 1258, 1261-62 (8th Cir. 1994).  *Cf. Bakhtiari v. Lutz*, 507 F.3d 1132 (8th Cir. 2007) (state university officials entitled to sovereign immunity in § 1981 and § 1983 claims if not sued in individual capacity).  Moreover, Counts II and III of the Complaint, which assert facial challenges, are addressed to the Defendants in their official capacities and are limited to requests for prospective, injunctive relief.  Accordingly, sovereign immunity has no application in these respects.  *Ex parte Young*, 209 U.S. 123 (1908).

### D. Exhaustion Is Not Required Under Section 1983

Defendants' argument that Plaintiffs' procedural due process claims should be dismissed is mystifying because the Complaint contains no such claims. Count I alleges as-applied violations of Plaintiff's First and Fourteenth Amendment rights to free expression; Count II is a facial challenge to ISU's trademark policies based on overbreadth; and Count III is a facial challenge to ISU's trademark policies based on vagueness. Accordingly, Defendants' argument that procedural due process claims require exhaustion of state remedies before filing in federal court simply does not apply to this case.[8]

Section 1983 provides every citizen with a federal civil remedy for the violation of federal rights and allows immediate access to federal court without *any* requirement that state remedies be exhausted. The Supreme Court has held that "exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983." *Patsy v. Board of Regents of the State of Fla.*, 457 U.S. 496, 516 (1982). *See also Steffel v. Thompson*, 415 U.S. 452, 472–73 (1974) ("When federal claims are premised on [§ 1983] … we have not required exhaustion of state judicial or administrative remedies, recognizing the paramount role Congress has assigned to the federal courts to protect constitutional rights."). Consequently, Plaintiff's claims were properly presented to this Court.

---

[8] The cases Defendants cite relate solely to the issue of procedural due process and are thus irrelevant. *See* Motion at 11-12 (discussing *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1312 (8th Cir. 1997); *Christiansen v. West Branch Cmty. Sch. Dist.*, 674 F.3d 927 (8th Cir. 2012)).

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court to deny Defendants' Motion to Dismiss in its entirety.

Respectfully submitted,

By    /s/ Robert Corn-Revere

| | |
|---|---|
| | ROBERT CORN-REVERE (*admitted pro hac vice*) |
| MICHAEL A. GIUDICESSI |   bobcornrevere@dwt.com |
|   michael.giudicessi@faegrebd.com | RONALD G. LONDON (*admitted pro hac vice*) |
| FAEGRE BAKER DANIELS LLP |   ronnielondon@dwt.com |
| 801 Grand Avenue, 33rd Floor | LISA B. ZYCHERMAN (*admitted pro hac vice*) |
| Des Moines, IA 50309-8011 |   lisazycherman@dwt.com |
| Telephone: (515) 447-4701 | DAVIS WRIGHT TREMAINE LLP |
| Facsimile: (515) 248-9010 | 1919 Pennsylvania Avenue, NW, Suite 800 |
| | Washington, DC 20006 |
| | Telephone: (202) 973-4200 |
| | Facsimile: (202) 973-4499 |

*Attorneys for Plaintiffs*
*Paul Gerlich and Erin Furleigh*

**Certificate of Service**

The undersigned hereby certifies that a true copy of the **Plaintiffs' Resistance to Defendants' Motion to Dismiss (Oral Argument Requested)** was served upon the Defendants through the Court's CM/ECF filing system on the 22nd day of September 2014.

      /s/ Robert Corn-Revere

Copy to:

Thomas J. Miller
Tyler M. Smith
 *tyler.smith@iowa.gov*
George A. Carroll
 *george.carroll@iowa.gov*

*Attorneys for Defendants*