IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| PAUL GERLICH and ERIN FURLEIGH, | |
|     Plaintiffs, | |
| | **No. 4:14-cv-00264 – JEG** |
| v. | |
| STEVEN LEATH, WARREN MADDEN, THOMAS HILL, and LEESHA ZIMMERMAN, | **O R D E R** |
|     Defendants. | |

This matter comes before the Court on Motion to Dismiss by Defendants Steven Leath, Warren Madden, Thomas Hill, and Leesha Zimmerman (collectively, Defendants). Plaintiffs Paul Gerlich and Erin Furleigh (collectively, Plaintiffs) resist. A hearing on the Motion was conducted on November 19, 2014. Attorneys Robert Corn-Revere and Michael A. Giudicessi were present on behalf of Plaintiffs, and Iowa Assistant Attorney General Tyler M. Smith was present on behalf of Defendants. The Motion is fully submitted and ready for disposition.

## I.    BACKGROUND[1]

The National Organization for the Reform of Marijuana Laws (NORML) is a national advocacy group that supports the legalization of marijuana for responsible use by adults. NORML was founded in 1970 and currently has over 135 chapters nationwide, including chapters located on college and university campuses. NORML ISU is a chapter of NORML and is an approved campus organization at Iowa State University. NORML ISU seeks to promote a better understanding of the current status of laws concerning marijuana in the Iowa and in the Unites States and advocates for reasonable treatment of marijuana in the laws of the state of Iowa and the United States. NORML ISU currently has over 500 members. Plaintiffs Paul

---

[1] The Court must accept as true all facts alleged in the Complaint for purposes of a Rule 12(b)(6) motion to dismiss. Zutz v. Nelson, 601 F.3d 842, 848 (8th Cir. 2010).

Gerlich and Erin Furleigh are students at Iowa State University and are members of NORML ISU.  Gerlich and Furleigh serve respectively as president and vice-president of the group. NORML ISU produces apparel as part of the groups's effort to raise awareness of its organization and to promote its cause.

As with any approved campus student organization, NORML ISU has been allowed to use the school's various identifying logos and marks in connection with the activities of the student organization.  However, this is subject to compliance with university design standards.

Any use by a campus organization of Iowa State University's licensed trademarks, including the abbreviation "ISU," must be in compliance with the design standards established by the university and approved by the university's Trademark Office.  Defendant Leesha Zimmerman is Program Director of the Trademark and Licensing Office at Iowa State University.  In October 2012, NORML ISU submitted a t-shirt design to the Trademark Office that stated "NORML" on the front of the shirt, with the "O" replaced by an image of the school's mascot, Cy the cardinal. The back of the shirt read "Freedom is NORML at ISU" and contained a small image of a marijuana leaf above the organization's name.  The Trademark Office approved the t-shirt design, and the organization subsequently produced and sold 100 t-shirts.  NORML ISU submitted an additional order for $500 worth of t-shirts.  The order, however, was never fulfilled.

On November 19, 2012, the Des Moines Register published a front-page article discussing the legalization of marijuana in Iowa.  The article included a picture of then-NORML ISU student president Joshua Montgomery wearing the organization's t-shirt.  On November 30, Defendant Thomas Hill, Senior Vice-President for Student Affairs, and Defendant Warren Madden, Senior Vice-President of Business & Financial Affairs, called a meeting with representatives of NORML ISU, including Furleigh, and informed the students that Iowa State University had rescinded the approval of the organization's t-shirt design.  Hill and Madden stated that the use of an image of

Cy as the "O" in NORML suggested that the university itself supported the legalization of

marijuana.  Hill and Madden cited a Letter to the Editor published in the Des Moines Register

that was critical of the university's apparent support of marijuana legalization.  Additionally, Hill

and Madden feared that the t-shirt design would cause the university to lose state funding and

alumni donations.

Hill and Madden also informed the organization that its group advisor, James Wilson, was

removed as the group's faculty advisor.  Wilson, a custodial staff member at the university, was

removed because his involvement with the organization violated union rules.  Hill offered to act

as NORML ISU's interim adviser until the organization found another permanent advisor.

Psychology professor Eric Cooper became NORML ISU's permanent advisor in February 2013;

nevertheless, Plaintiffs claim Hill has not relinquished his position as interim advisor and has

interfered with the organization's internal affairs.

Effective January 16, 2013, the Trademark Office revised the university's Trademark

Guidelines to include the following relevant restrictions:

> No designs that use University marks that suggest promotion of the below listed items
> will be approved:
>
> • dangerous, illegal or unhealthy products, actions or behaviors;
> • drugs and drug paraphernalia that are illegal or unhealthful.

Id. at ¶ 39; Guidelines for University Trademark Use 6(e), ECF No. 1-1.  Madden acknowledged

that the revision was done as a result of a number of external comments regarding NORML ISU's

t-shirt design and the university's perceived association with marijuana rights advocacy.

In February 2013, Montgomery emailed Steven Lukan, Director of the Iowa Office of Drug

Control Policy, and invited him to an event NORML ISU was planing with prominent advocates

of marijuana legalization.  Montgomery encouraged Lukan to attend the event, and Plaintiffs

allege he stated, "please don't be afraid to come to this event."  Id. at ¶ 42.  The email also

referenced NORML ISU's new t-shirt design.  After receiving the email, Lukan contacted the

president of Iowa State University, Defendant Steven Leath, and addressed his disapproval of the

organization's t-shirt design and Montgomery's manner of contacting him.  Leath directed Hill to

address the situation with the organization.  Hill met with Montgomery, Furleigh, and another

student member and expressed his displeasure on behalf of the university concerning the group's

contact with Lukan.  Hill accused Montgomery of threatening Lukan.

On February 12, 2013 – after the revised Trademark Guidelines had become effective – the

Trademark Office approved a t-shirt design submitted by NORML ISU that stated "NORML ISU"

on the front and "We are NORML" across the back – without the image of the marijuana leaf that

was on the previous design.  On April 15, 2013, the Trademark Office approved another t-shirt

design that simply stated "NORML ISU Student Chapter" on the front.

In May or June 2013, the organization submitted another t-shirt design to the Trademark

Office for approval.  The front of this t-shirt had the slogan "NORML ISU Supports Legalizing

Marijuana" with a marijuana leaf graphic.  The back of the t-shirt design spelled out the acronym

NORML:  "National Organization for the Reform of Marijuana Laws."  On June 13, 2013,

Zimmerman, on behalf of the Trademark Office, denied the t-shirt design, stating that it repre-

sented a call to action, the message could be misconstrued as the university's position on

marijuana, the design was unnecessarily sensational, and the design would not change the public's

perception of marijuana.  Hill supported Zimmerman's decision to deny the organization's t-shirt

design.  NORML ISU did not appeal the decision.  NORML ISU believed an appeal would be

futile because Madden, who oversees the Trademark Office and created the revised Trademark

Guidelines, was the individual empowered to decide any appeals to the office's application of

the Guidelines.

In March 2014, NORML ISU submitted a t-shirt design that displayed "NORML ISU" on the front in ink that was varied to create an outline of a marijuana leaf.  The design was denied. The Trademark Office indicated that the full organization's name needs to be inserted in the design, and the silhouette of the marijuana leaf must be removed because it is a symbol of an illegal drug.

On March 11, 2014, the Foundation for Individual Rights in Education (FIRE), a non-partisan, non-profit, civil rights organization that seeks to protect free expression on college campuses, sent a letter to Leath indicating that the university's application of the Trademark Guidelines to NORML ISU violated the First Amendment.  Iowa State University's associate general counsel, Keith Bystrom, responded on April 29, 2014, disputing FIRE's claims that the Trademark Guidelines are unconstitutional.

On July 1, 2014, Plaintiffs filed a Complaint against Defendants under 42 U.S.C. § 1983 for alleged violations of their First and Fourteenth Amendment rights.  Plaintiffs' claims are based on Defendants' acts of withdrawing approval of the NORML ISU t-shirt design after state officials and members of the public complained about the t-shirt's message, adopting and enforcing the new trademark regulations to expressly restrict NORML ISU's message, rejecting two additional t-shirt designs, and impeding NORML ISU's dissemination of its message by Hill's continued involvement as interim advisor.  Plaintiffs allege the actions of Defendants Madden and Zimmerman, as endorsed by Defendants Leath and Hill, violated clearly established constitutional rights of which reasonable administrators and staff should have known.

Count I alleges as-applied violations of Plaintiffs' rights to free speech under the First and Fourteenth Amendments.  Count II alleges that the Trademark Guidelines are facially overbroad in violation of Plaintiffs' right to free speech under the First and Fourteenth Amendments.  Count III alleges the Trademark Guidelines are facially vague in violation of Plaintiffs' right to free speech

under the First and Fourteenth Amendments.  Count IV requests a declaratory judgment and injunction declaring the Trademark Policy unconstitutional on its face and as-applied, and that it violates Plaintiffs' First and Fourteenth Amendment rights.  In addition to a declaratory judgment and a permanent injunction, Plaintiffs request compensatory damages and reasonable costs and expenses, including attorneys' fees.  Plaintiffs request a trial by jury on all issues that are properly triable by jury.

On September 9, 2014, Defendants filed a motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  Defendants argue the Complaint should be dismissed in its entirety because Plaintiffs have failed to plead sufficient facts alleging Defendants violated a constitutional right.  Defendants argue that this case is about Plaintiffs' desire to use Iowa State University's *trademarks* and does not contain plausible allegations of a constitutional violation. Under a trademark analysis, Defendants argue Plaintiffs have failed to plead that they lacked adequate alternative avenues of communication without the use of Iowa State University's trade- marks; their t-shirt designs constitute fair use of Iowa State University's trademarks; or that their t-shirt designs do not create confusion as to whether the university sponsored, endorsed, or is otherwise affiliated with the speech.  If the Court finds Plaintiffs have pled sufficient facts to establish a constitutional violation, Defendants argue the claims against them in their individual capacities should be dismissed because they are protected by qualified immunity and that all of the claims against Leath should be dismissed because they are implausible on their face.  Defendants argue Plaintiffs' claims for money damages against Defendants in their official capacities should be dismissed because they are protected by Eleventh Amendment sovereign immunity.  Defen- dants also argue that any claims for Fourteenth Amendment procedural due process violations should be dismissed because Plaintiffs have failed to exhaust their administrative remedies.

Plaintiffs filed a resistance to Defendants' motion on September 22, 2014.  Plaintiffs argue Defendants have improperly framed this case to be about trademarks when this is actually a civil rights case concerning the university officials' implementation of a regime of unconstitutional viewpoint discrimination against a student group in violation of the First and Fourteenth Amendments.  Plaintiffs argue qualified immunity does not apply in this case because the Complaint adequately sets forth facts establishing a violation of a constitutional right and that such right was clearly established at the time of the misconduct.  Plaintiffs argue that even if qualified immunity applies to Defendants in their individual capacity, it does not preclude declaratory or injunctive relief from Defendants in their official capacity.  Further, Plaintiffs assert that individual capacity claims against Leath cannot be dismissed because liability is predicated on Leath's direct actions, not *respondeat superior*.  Plaintiffs also contend that Defendants cannot escape liability on the basis of sovereign immunity under the Eleventh Amendment.  Plaintiffs further maintain that their Complaint does not make a procedural due process claim and therefore they are not required to exhaust administrative remedies.

Defendants replied to Plaintiffs' resistance on October 27, 2014.  In their reply, Defendants argue that what is at issue is not private student group speech, but rather government speech through the university's control of its trademarks.  Defendants argue Plaintiffs have no First Amendment right to use Iowa State University's trademarks, which they assert is government speech.  Even if the Court finds Defendants' control over Iowa State University's trademarks is not government speech, Defendants argue that they may regulate student speech that might be perceived to advocate illegal drug use.  Defendants contend they did not deny Plaintiffs a benefit by restricting their use of Iowa State University's trademark, but rather ensured that the trademark was used for the limited purpose of which is was authorized.

7

## II.    DISCUSSION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  The Court must "accept[ ] as true all factual allegations in the complaint and draw[ ] all reasonable inferences in favor of the nonmoving party."  Simes v. Ark. Judicial Discipline & Disability Comm'n, 734 F.3d 830, 834 (8th Cir. 2013) (quoting Richter v. Advance Auto Parts, Inc., 686 F.3d 847, 850 (8th Cir. 2012) (per curium)).  The complaint must "be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible."  Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009).  In assessing the plausibility of a complaint, a court may "consider materials outside the pleadings, such as materials that are necessarily embraced by the pleadings and exhibits attached to the complaint."  Mattes v. ABC Plastics, Inc., 323 F.3d 695, 697 n.4 (8th Cir. 2003) (quotations and citations omitted).

### A.    Constitutional Violation

"Section 1983 imposes liability for certain actions taken 'under color of 'law that deprive a person 'of a right secured by the Constitution and laws of the United States.'"  Dossett v. First State Bank, 399 F.3d 940, 947 (8th Cir. 2005) (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 931 (1982)).  Therefore, in order "[t]o state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).

As an initial matter, the Court must address Defendants' creative argument that this case really alleges trademark protection issues rather than constitutional violations. While that may be the issue in quite different factual circumstances, the Court must conclude it is not the issue at bar.

The Complaint specifically asserts claims under 42 U.S.C. § 1983 for constitutional violations and does not allege any claims relating to trademark rights. Simply because the allegations involve the use of Iowa State University's licensed trademarks does not take away the suit's constitutional nature. Defendants cite the Eighth Circuit's language in Mutual of Omaha Insurance Company v. Novak that trademarks do not "yield to the exercise of First Amendment rights under circumstances where adequate alternative avenues of communication exist." 836 F.2d 397, 402 (8th Cir. 1987) (quoting Lloyd Corp. v. Tanner, 407 U.S. 551, 567 (1972)). Novak is inapplicable to this case because it dealt with an individual's claim that his use of a design similar to Mutual of Omaha's registered trademark was an exercise of his right to free speech under the First Amendment. Id. The Court held that the First Amendment does not give individuals authority to infringe on the rights of a trademark holder. Id. No infringement is involved in the case at hand. The organization herein was generally allowed the use of university logos and marks, within certain design parameters; and, the question is whether the use was restricted in this instance through constitutionally impermissible actions. Therefore, the appropriate discussion is whether Plaintiffs have alleged a plausible constitutional violation.

The Complaint makes three express constitutional claims: a challenge to the university's policies and actions as an as-applied violation of Plaintiffs' First and Fourteenth Amendment right to free speech; a challenge to the Trademark Guidelines as facially overbroad in violation of Plaintiffs' First and Fourteenth Amendment right to free speech; and a challenge to the Trademark Guidelines as facially vague in violation of the First and Fourteenth Amendments. The Complaint

alleges Defendants' acts of withdrawing approval of NORML ISU's t-shirt designs, modifying the Trademark Guidelines, and intervening into NORML ISU's internal affairs constitute unconstitutional viewpoint discrimination.

Courts have long afforded protection to First Amendment rights of students at public colleges and universities.  See Healy v. James, 408 U.S. 169, 180 (1972) ("[S]tate colleges and universities are not enclaves immune from the sweep of the First Amendment."); see also Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969) ("It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.").  In Healy v. James, a student group at a state college was denied status as an official campus organization by the college president because of the school's disagreement with the group's philosophies.  408 U.S. at 170-71.  The students desired to form a local chapter of the Students for a Democratic Society, a national organization which advocated for the advancement of leftist ideas and philosophies.  Id. at 171-73.  The group's application was denied by the college president primarily because of a fear of the group's association with the national organization, which had been responsible for civil disobedience on campuses across the country in prior years.  Id. at 171.  In holding the college's reasons for denying the organization official campus recognition were insufficient, the Court noted that "[t]he College, acting here as the instrumentality of the State, may not restrict speech or association simply because it finds the views expressed by any group to be abhorrent."  Id. at 187-88.

In Rosenberger v. Rector and Visitors of the University of Virginia, the University of Virginia withheld student activity fund payments – a fund made up of mandatory student fees – to a campus group primarily because the group discussed a particular religious belief in its newspaper publication.  515 U.S. 819, 823, 826 (1995).  The university's guidelines on fund

distribution prohibited the distribution of student activity funds for a "religious activity." Id. at

825. Members of the student group challenged the school's actions and the guidelines under 42

U.S.C. § 1983 for violating their First Amendment rights to freedom of speech and press. Id. at

827. The Court described the constitutional principles of viewpoint discrimination as follows:

> It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys. Other principles follow from this precept. In the realm of private speech or expression, government regulation may not favor one speaker over another. Discrimination against speech because of its message is presumed to be unconstitutional. These rules informed our determination that the government offends the First Amendment when it imposes financial burdens on certain speakers based on the content of their expression. When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.

Id. at 828-29 (citations and quotations omitted). The Supreme Court noted that a state may not

exclude speech due to a distinction that is not reasonable in light of the purpose served by the

forum, nor may the state discriminate against speech on the basis of its viewpoint. Id. at 829.

Under these guiding principles, the Court held the university's denial of payment to the student

organization was a form of viewpoint discrimination that violated the First Amendment. Id. at

836. The Court stated, "[f]or the University, by regulation, to cast disapproval on particular viewpoints of its students risks the suppression of free speech and creative inquiry in one of the vital

centers for the Nation's intellectual life, its college and university campuses." Id.

The Eighth Circuit addressed viewpoint discrimination in the college setting in Gay and

Lesbian Students Association v. Gohn, 850 F.2d 361 (8th Cir. 1988). In Gohn, a student group

that advocated for gay and lesbian rights (GLSA) at the University of Arkansas at Fayetteville was

denied student funding by the university. Id. at 362. The GLSA had met all of the objective

criteria to receive funding, all other groups that met the criteria received funding, and there was no

11

shortage of available funds.  Id. at 367.  Some members of the student senate admitted that they

voted against the GLSA receiving funds because of the group's views on homosexuality.  Id.

Further, university officials were pressured by state legislators to not fund the GLSA or to support

any opinions tolerant of homosexuality.  Id.  The Court noted that the GLSA did not advocate for

any activity that was illegal, but even if it did, its speech would still be protected by the First

Amendment.  Id. at 368.  The Court held the university's denial of funding was a form of view-

point discrimination in violation of the First Amendment.  Id. ("Conduct may be prohibited or

regulated, within broad limits.  But government may not discriminate against people because it

dislikes their ideas, not even when the ideas include advocating that certain conduct now criminal

be legalized.").

     The Complaint alleges that Defendants prohibited NORML ISU from making any reference

in its t-shirts to the object of the group's advocacy, marijuana.  Plaintiffs are excluded from using

both the word "marijuana" and any images relating to marijuana.  It is alleged that Defendants

denied NORML ISU the use of Iowa State University's trademarks after the university received

pressure from donors and members of the legislature who disagreed with NORML ISU's message

and the university's association with the group's message.  The Complaint alleges that other

campus groups were permitted to use Iowa State University's trademarks, despite their support of

potentially controversial philosophies and ideas.  The decisions of Healy, Rosenberger, and Gohn

are guiding as they hold that college administrators cannot control the speech of campus groups

because of disagreements with the groups' viewpoints.  Although the prior cases dealt with

students' rights to associate and to receive school funding – unlike the use of the university's

trademarks as alleged here – each case concerns a university discriminating against a student

group based on the group's viewpoints by denying the group a university benefit provided to other

groups.  Like the entitlement to funding, one of the benefits of being a school-approved student

organization at Iowa State University is the ability to use the school's name and logo for certain

purposes.  Compl. ¶ 25, ECF No. 1; see also Christian Legal Soc. Ch. of the Univ. of Cal.,

Hastings Coll. of Law v. Martinez, 561 U.S. 661, 669 (2010) (noting that one of the benefits

student groups receive is the use of the school's name and logo).  Furthermore, Gohn stated that

universities cannot deny a student group benefits based on the group's message, even if the

message or philosophy it advocates is illegal.  850 F.2d at 368.  Accordingly, Plaintiffs have pled

sufficient factual allegations to create a plausible claim for relief for violations of their First and

Fourteenth Amendment rights to free speech.

Defendants argue that Plaintiffs have not alleged a plausible claim because the speech at

issue is not private speech, but rather is government speech.  When the government speaks,

individuals and groups cannot use the First Amendment to challenge a government message that

conflicts with private viewpoints.  Rosenberger, 515 U.S. at 833; Johanns v. Livestock Mktg.

Assoc., 544 U.S. 550 (2005).  Courts analyze two factors to determine if the speech at issue is

government speech or private speech:  (1) whether the government set the message; and

(2) whether it approved and controlled the communicated message.  Johanns, 544 U.S. at 562.

Defendants rely on the Supreme Court's decisions in Rust v. Sullivan, 500 U.S. 173 (1990),

and Pleasant Grove City, Utah v. Summum, 555 U.S. 460 (2009).  In Rust, Title X recipients and

doctors challenged the Secretary of Health and Human Services' regulations that no funds appro-

priated under Title X of the Public Health Service Act of 1970 could be used in programs where

abortion was a method of family planning.  Id. at 181.  The regulations stated that funds could

only be used "to support preventative family planning services," and that counselors under the

plan could not mention abortion as an option, refer individuals to an abortion clinic, nor could

they use Title X funds to advocate for abortion. Id. at 179-80. The recipients and doctors challenged the regulations maintaining that they were subjected to viewpoint discrimination in violation of the First Amendment. Id. at 181. The Supreme Court upheld the regulations and noted that "when the Government appropriates public funds to establish a program it is entitled to define the limits of that program." Id. at 195. The Court stated,

> The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way. In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other.

Id. at 193.

In Pleasant Grove, a city rejected a permanent monument offered by a religious organization to be placed in a city park. 555 U.S. at 465. The city had previously permitted a permanent monument of the Ten Commandments to be placed in the park. Id. The city passed a resolution requiring park monuments to directly relate to the city's history or a group's longstanding ties with the community. Id. The religious organization brought suit under § 1983 alleging viewpoint discrimination in violation of the First Amendment. Id. at 466. The Supreme Court stated that permanent monuments displayed on public property are a form government speech because the city controlled the message in that it "has selected those monuments that it wants to display for the purpose of presenting the image of the City that it wishes to project to all who frequent the Park." Id. at 472. As government speech, the monuments do not run afoul of the Free Speech Clause. See id. at 467-68.[2]

---

[2] The Supreme Court has not further defined the parameters of the government speech doctrine since Pleasant Grove. However, the Supreme Court recently granted a petition for writ of certiorari in Texas Division, Sons of Confederate Veterans, Inc. v. Vandergriff, 759 F.3d 388 (5th Cir. 2014), cert. granted, 83 U.S.L.W. 3101, 2014 WL 3890320 (U.S. Dec. 1, 2014) (No. 14-144), to determine whether the government speech doctrine permits a state to control the messages that are displayed on specialty license plates.

Defendants have not cited to any cases applying the government speech doctrine to the context of this case, nor have they referred the Court to any cases discussing government speech by a college or university.  In the cases cited by Defendants, it was apparent that the venue in which the speech was delivered was closely associated with the government (i.e., city park and government regulation).  Moreover, other cases suggest that speech by collegiate student organizations is not government speech.  See Bd. of Regents of Univ. of Wis. Sys v. Southworth, 529 U.S. 217, 229 (2000) (holding that a mandatory activity fee to fund student dialogue does not violate the First Amendment and noting that the University of Wisconsin articulated that speech of student organizations was not government speech); Rosenberger, 515 U.S. at 834 ("The distinction between the University's own favored message and the private speech of students is evident in the case before us.").  It is undetermined whether a college organization's t-shirt is speech controlled by the state university or private speech controlled by the organization.  Reading the allegations in the Complaint in the light favorable to Plaintiffs, it cannot be determined that the speech at issue was government speech outside of the bounds of the First Amendment.  At this stage of the litigation, the government speech doctrine cannot preclude Plaintiffs claims from moving forward.

Defendants also cite Hazelwood School District v. Kuhlmeier, 484 U.S. 260 (1988), and Morse v. Frederick, 551 U.S. 393 (2007), for the proposition that public schools may regulate student speech that is inconsistent with the fundamental values of public school education.  However, cases concerning students' speech in high schools, such as in Hazelwood and Morse, are inapplicable to this case because high schools are classified as private forums and thereby the schools may regulate the content of student speech in a reasonable manner.  Morse, 551 U.S. at 404-05 ("[T]he constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." (quoting Bethel Sch. Dist. No. 403 v. Fraser, 478

15

U.S. 675, 682 (1986))); <u>Hazelwood</u> at 267-70.  In this case, NORML ISU is advocating its message in a public university setting, which presents characteristics of a public forum.  <u>See Bowman v. White</u>, 444 F.3d 967, 979 (8th Cir. 2006) (holding that open common areas of a public university were classified as public forums in which the government's ability to control speech was most circumscribed).

Accordingly, the Complaint alleges sufficient facts to support claims pursuant to 42 U.S.C. § 1983 for constitutional violations of Plaintiffs' First and Fourteenth Amendment rights to free speech.

### B.   Qualified Immunity

Qualified immunity shields government officials, acting under the color of state law, from personal liability under 42 U.S.C. 1983.  Public officials are entitled to qualified immunity in their individual capacity if their actions do not violate clearly established law of which a reasonable person in the official's position would be aware.  <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009).  Courts have adopted a two-prong test for qualified immunity.  <u>Jones v. McNeese</u>, 675 F.3d 1158, 1161 (8th Cir. 2012).  The first prong asks whether, taken in the light most favorable to the party asserting injury, the facts alleged demonstrate a violation of a statutory or constitutional right.  <u>Id.</u>  The second inquiry is whether that right was "clearly established" at the time of the government official's alleged conduct such that it would have been clear to a reasonable person that the conduct was unlawful under the circumstances.  <u>Id.</u>

As discussed above, Plaintiffs have pled sufficient facts to make out a violation of a constitutional right.  Therefore, whether qualified immunity applies depends on the determination of whether such violation was clearly established at the time of the misconduct.  "For the purposes of step two, 'clearly established' means '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that rights.'"  <u>Id.</u> (citing

Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  When addressing step two at the motion to dismiss stage, "it is the defendant's conduct *as alleged in the complaint* that is scrutinized for 'objective legal reasonableness.'"  Behrens v. Pelletier, 516 U.S. 299, 309 (1996); see also Bradford v. Huckabee, 394 F.3d 1012, 1015 (8th Cir. 2005) ("To prevail at [the motion to dismiss] stage of the proceedings, defendants must show that they are entitled to qualified immunity on the face of the complaint.").

The Eighth Circuit has stated,

> In order to determine whether a right is clearly established, it is not necessary that the Supreme Court has directly addressed the issue, nor does the precise action or omission in question need to have been held unlawful.  In the absence of binding precedent, a court should look to all available decisional law including decisions of state courts, other circuits and district courts . . . .

Hayes v. Long, 72 F.3d 70, 73-74 (8th Cir. 1995).  Although the specific facts of this case have not been addressed by other courts, it has long been held that college administrators cannot deny benefits to a recognized student group because of the organization's viewpoints.  See Rosenberger, 515 U.S. at 841; Healy, 408 U.S. at 187-88; Gohn, 850 F.2d at 368.

Count I of the Complaint, alleges that "Defendants Madden and Zimmerman's actions, as endorsed by Defendants Leath and Hill, violated clearly established constitutional rights of which all reasonable administrators and staff should have known."  Compl. ¶ 69, ECF No. 1. The Complaint makes factual allegations that Defendants deprived NORML ISU of the use of Iowa State University's trademarks and interfered with its internal affairs because of the organization's viewpoints.  Id. at ¶ 64-67.  The Complaint cites Healy for the proposition that student speech is protected on college campuses against viewpoint discrimination.  Id. at ¶ 60. At this stage of the litigation, the Complaint, as pled, sufficiently alleges facts indicating that a reasonable college administrator would know that restricting students' speech based on view-point is a constitutional violation.

### C.   Claims against Defendant Leath

Defendants argue all of the claims against Leath should be dismissed because government officials cannot be held liable under the legal theory of *respondeat superior* for the conduct of their subordinates, and the Complaint does not allege that Leath violated Plaintiffs' rights by any of his own misconduct.  Although Defendants are correct that "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*," the Complaint alleges sufficient conduct by Leath himself that violates Plaintiffs' constitutional rights.  Iqbal, 556 U.S. at 675-76; see also Parrish v. Ball, 594 F.3d 993 (2010).  Paragraph 44 of the Complaint alleges that "Leath *directed* Defendant Hill to address the situation involving the t-shirt designs and the group's contact with Lukan."  Compl. ¶ 44, ECF No. 1 (emphasis added).  Viewing the facts in the light most favorable to Plaintiffs, and accepting for purposes of the current motion that Leath's direction was to limit the group's activity as generally alleged, the Complaint at least minimally alleges direct actions by Leath as a basis for the alleged constitutional violations.

### D.   Sovereign Immunity

Defendants argue Plaintiffs' claims for money damages against Defendants in their official capacities should be dismissed because Defendants have sovereign immunity under the Eleventh Amendment.  Official capacity actions seeking prospective, injunctive relief are not treated as actions against the State for purposes of the Eleventh Amendment.  Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 n.10 (1979).  All Counts alleged in the Complaint seek prospective and injunctive relief against Defendants in their official capacities and are therefore not barred by sovereign immunity.  As to claims for money damages in Count I, Defendants are sued in their individual capacity, and therefore money damages are not barred by the Eleventh Amendment.

**E.   Procedural Due Process**

Defendants argue Plaintiffs' claims for procedural due process should be dismissed because they failed to exhaust their administrative remedies.  This argument is without merit.  The Complaint does not assert any claims for violations of procedural due process.  Plaintiffs plead violations of the Fourteenth Amendment solely because the Fourteenth Amendment binds the state government to the protections of the First Amendment.

Further, there is generally no requirement under § 1983 that Plaintiffs must exhaust all administrative remedies before bringing suit.  Patsy v. Bd. of Regents of the State of Fl., 457 U.S. 496, 516 (1982) ("[E]xhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983.").  Although there is an exception to the Patsy rule – "[u]nder federal law, a litigant asserting a deprivation of procedural due process must exhaust state remedies before such an allegation states a claim under § 1983" – that exception is inapplicable here.  See Hopkins v. City of Bloomington, No. 13-3378, 2014 WL 7238039, at *2 (8th Cir. Dec. 22, 2014).

**III.   CONCLUSION**

For the reasons stated, Defendants' Motion to Dismiss, ECF No. 9, must be **denied**.

**IT IS SO ORDERED.**

Dated this 6th day of January, 2015.

JAMES E. GRITZNER, Chief Judge
U.S. DISTRICT COURT