IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| PAUL GERLICH and ERIN FURLEIGH,<br><br>     Plaintiffs,<br><br>  v.<br><br>STEVEN LEATH, WARREN MADDEN,<br>THOMAS HILL, and LEESHA<br>ZIMMERMAN,<br><br>     Defendants. | CASE NO. 4:14-cv-00264<br><br><br><br>**DEFENDANT'S RESPONSES TO<br>PLAINTIFFS' STATEMENT OF<br>UNDISPUTED MATERIAL FACTS** |

COME NOW Defendants, by and through undersigned counsel, and for their Responses to Plaintiffs' Statement of Undisputed Material Facts, pursuant to Federal Rule of Civil Procedure 56, state as follows:

1.    **Admit.**

2.    **Admit.**

3.    **Deny.**  Objection to Dep. Ex. AU at P. App. 31-47 as inadmissible hearsay.

4.    **Qualify.**  Furleigh did not design the shirt (Depo. at 62-63; P. App. 9) and the t-shirt was sold at cost (Depo. at 65; P. App. 10); and Gerlich was not a member of NORML ISU at the time (D. App. 456).

5.    **Qualify.**  The article discusses the "support" NORML ISU has received from Iowa State University, among other things.  (J. App. 101-104).

6.    **Deny.**  The cited portions of the appendix do not state when additional t-shirt requests were received and thus do not support the statement.

7.    **Deny.**  The Trademark Licensing Program Guidelines at the time provided in part that designs using ISU marks "must… appropriately portray the image of Iowa State University," that the "[m]ark cannot be incorporated into or dominated by the marks of others," and that "No

1

products considered dangerous or offensive will be approved, including but not limited to products… promoting firearms, drugs, alcohol, gambling, gaming or tobacco." D. App. 65-66, 68; J.S. 16.

8.    **Qualify.**  Furleigh believed having Cy the Cardinal on the shirt would make people think "It's not just NORML, it's Iowa State…" (Depo. at 66; P. App. 10).  The cited testimony does not speak on behalf of NORML ISU members.

9.    **Deny.**  The cited portions of the appendix do not state plaintiffs were deterred from political advocacy; Furleigh described the "other things" she might have done as "only a hypothetical", admitted that any inaction on her part was self-imposed concern about misrepresenting the university, and agreed that she would have discussed such deterred actions in the thousands of pages of emails produced in this case, not one of which are cited to in this statement of fact.  Furleigh Depo. at 246-249; P App. 20-21.

10.   **Qualify.**  The cited portions of the appendix reflect that university officials do not intend to endorse recognized student organizations by permitting them to use ISU trademarks regardless of whether they are "controversial".

11.   **Admit.**

12.   **Qualify.**  The cited portion of the record states that "the use of the University marks by the group [CUFFS] was controversial," (P. App. 110), not that the Trademark Office's decision to license the use was controversial; and the cited portion states that Madden did not consider the group's use of marks to demonstrate university support, not that others could not interpret the use as demonstrating university support.

13.   **Qualify.**  The cited portion of the appendix concerns preliminary deposition matters and background information and does not support this statement.  Rather, statements to this effect appear at P. App. 110.

2

14.     **Admit.**

15.     **Admit.**

16.     **Qualify.**  Madden explained that the "societal issues that they are supporting are controversial in some people's minds."  P. App. 110.  Further, read properly, the cited portion of the appendix states that Madden did not consider the group's use of marks to demonstrate university support, not that others could not interpret the use as demonstrating university support.

17.     **Admit.**

18.     **Admit.**

19.     **Admit.**

20.     **Admit.**

21.     **Admit.**

22.     **Admit.**

23.     **Admit.**

24.     **Admit.**

25.     **Admit.**

26.     **Admit.**

27.     **Qualify.**  The image shows Cy the Cardinal leaning on an epee, not holding it.  P. App. 63.

28.     **Admit.**

29.     **Qualify.**  One design was approved, one was denied.  P. App. 60-61.

30.     **Qualify.**  Leath did not describe the club as controversial, only that "there were some complaints about the Rodeo Club" that "it's a violation of animal rights to participate in rodeo."  P. App. 161.

31.     **Qualify.**   Madden did not describe boxing as a controversial sport, only that "there are individuals that don't believe boxing is an appropriate form of athletic competition." P. App. 111.

32.     **Admit.**

33.     **Admit.**

34.     **Admit.**

35.     **Qualify.**  One design was approved, one was denied.  P. App. 72-73.

36.     **Qualify.**   The koozies are described as "Bottle Koozie", not as "Beer bottle koozies" as suggested by Plaintiffs.  P. App. 200.

37.     **Deny.**   There is no evidence in the cited portions of the Appendix that these designs were "for the consumption of alcohol."

38.     **Qualify.**  Madden did not "investigate" NORML ISU's status; he reviewed the organization's status which is a condition for eligibility to use university marks, and observed that a contract-covered employee was serving as NORML ISU's adviser, thus creating overtime and other legal implications.  P. App. 128.

39.     **Qualify.**  Madden did not "investigate" NORML ISU's status; he reviewed the organization's status which is a condition for eligibility to use university marks, and observed that a contract-covered employee was serving as NORML ISU's adviser, thus creating overtime and other legal implications.  P. App. 128.

40.     **Qualify.**  Hill and Madden relied on Lackey's description of the response to the Register article.  P. App. 99, 252.

41.     **Admit.**

42.     **Admit.**

43. **Qualify.** The cited portions of the appendix reflect it was agreed to clarify the guidelines, not to change them.

44. **Deny.** Defendants did not "rescind" the approval of the T-shirt Design #1; Madden stated, "We indicated that the current T-shirt they had produced was not in conformance with our policies." P. App. 136-A.

45. **Qualify.** Hill offered to serve as adviser so NORML ISU could maintain its status as a recognized student organization. J.S. 60-61.

46. **Qualify.** NORML ISU never asked Hill to step down as its adviser because ultimately NORML ISU decided it was in the club's best interest not to ask Hill to step down. D. App. 445-446, D. App. 471.

47. **Deny.** There was no "off-the-books" policy. The Program Guidelines in effect at the time provided in relevant part that designs using ISU marks "must… appropriately portray the image of Iowa State University," that the "[m]ark cannot be incorporated into or dominated by the marks of others," and that "No products considered dangerous or offensive will be approved, including but not limited to products… promoting firearms, drugs, alcohol, gambling, gaming or tobacco." D. App. 65-66, 68; J.S. 16.

48. **Deny.** This is an inaccurate characterization of the cited testimony. Neither Furleigh or Gerlich could concretely state how their speech was chilled or how they were being restricted from communicating their political message to the public. Rather, Furleigh described how they were disorganized and "just didn't know how to run an organization yet." P. App. 13. Gerlich's testimony was based on his erroneous belief that NORML ISU was one of the first groups to have a t-shirt design rejected, which it obviously was not. P. App. 23.

49.     **Qualify.**  According to Leath, "this whole modification was not strictly a result of the NORML one.  It was more a result of a cumulation of three or four issues in my tenure.  I said, 'We need to clean this up.  We can't constantly have to do this.'"  P. App. 146.

50.     **Deny.**  The cited portions of the Appendix related to T-Shirt Design #1, not NORML ISU's use of university trademarks in general.

51.     **Qualify.**  Leath went on to explain, "There are a lot of things that we do that we want to be very careful that everybody's treated fairly and openly, but there are some issues that are clearly going to cause controversy and it's better to manage them on the front end.  I would have expected them to do that, not necessarily change what they did or how they did it."  P. App. 160.

52.     **Qualify.**  Leath described the issue as one of perception, "We were trying to run a fine line on the edge of ISU doesn't endorse political positions unless they're already established by the Board of Regents.  So a T-shirt that looked like we were endorsing a political position was unacceptable.  It didn't mean the student's couldn't have any T-shirts.  In fact, I think we approved two designs for them."  D. App. 425 (Leath Depo. p. 32).

53.     **Qualify.**  The two quotes concern different matters, are taken out of context and then combined for a new proposition.  Regarding the first quote, the question pertained to an email a student sent to a government official in February 2013, months after the Register article.  D. App. 424 (Leath Depo. 29). Regarding the second quote, Leath was answering a question asked by counsel as to whether the public reaction to the Register article was an overreaction. P. App. 157.

54.     **Qualify.**  Vague as to what Plaintiffs mean by "the NORML ISU problem." Admit Defendants proceeded to review the trademark policy for clarification.

55. **Qualify.** Lackey felt the existing guidelines had been "interpreted inappropriately" to approve T-Shirt Design #1, and Plaintiffs omit the continuation of Leath's testimony where he agreed "the intent of this proposed change would be to make sure that the trademark office does not approve things that look like they are promoting illegal activities." D. Supp. App. 536 (Leath Depo. 165).

56. **Qualify.** Leath explained, "[Y]ou've got to be able to control your trademark, your logo…It has to be approved. You don't want to use it in a place that's inappropriate. You don't want it used next to a swastika." D. App. 432 (Leath 177:18-23).

57. **Admit.**

58. **Admit.**

59. **Qualify.** Madden had not given instructions to other groups at that particular time but has issued similar instructions to other groups before. Madden 147:25-148:4; D. App. 140.

60. **Deny.** Zimmerman said, "I can't think of anything specifically, but most likely in the 20 years I've been here, there's probably been a few that we've stopped and looked at twice or I've had input from others on campus." Zimmerman 173:4-11; P. App. 210.

61. **Qualify.** NORML ISU's design approval was not rescinded; they were allowed to keep all 100 shirts but each new order must be approved through Trademark and Licensing, and the new order for new shirts was denied. J. S. 17.

62. **Admit.**

63. **Deny.** The cited portion of the Appendix is a statement by Zimmerman that Madden asked to be apprised of design submissions by the Hockey Club.

64. **Qualify.** These were interim measures taken "out of fairness to the organization, they needed to continue with business and it was inappropriate for us to suspend everything until we went through a formal process, so what we tried to do was find a way to meet the needs of

both the student organization and the institution, and those were some interim measures that were taken." P. App. 261-262.

65.     **Admit.**

66.     **Qualify.** This occurred only as an interim measure. P. App. 261-262.

67.     **Qualify.** There were similar reviews for Hockey Club designs. P. App. 225. D. App. 418, D. App. 436-437, D. App. 132-157. P. App. 211.

68.     **Deny.** Zimmerman did not "monitor" NORML ISU fliers; she testified she "stumbled across" one on the ground walking across campus and reviewed it. P. App. 294. Zimmerman testified Hockey Club fliers had been reviewed in the past. P. App. 225 (Zimmerman Depo. at 249).

69.     **Deny.** Zimmerman raised question about the use of ISU logos, as opposed to word marks. P. App. 404.

70.     **Qualify.** Hill explained, "basically what I did was gave Josh a perspective of someone receiving his message and how that message could be received. As his advisor, I wanted to make him aware that his objective, as we talked, was to get Lukan to come; not to antagonize and not to do anything else. And I further said if that's your goal, then you need to be more respectful and invite him and not try to shame him into something like that." P. App. 268.

71.     **Deny.** The cited portion of the appendix reflects that Montgomery decided to send the apology and his peers (including Furleigh) were in agreement, not that Hill instructed him to do so. P. App. 393-394.

72.     **Qualify.** Montgomery sent the email on his own volition. P. App. 393-394.

73.     **Qualify.** Leath's comments were merely that "[i]t can use some editing, punctuation, spelling correction, ending sentences with a preposition etc." P. App. 395.

74. **Deny.** The cited portion of the appendix does not support the broad generalization for which Plaintiffs cite it: "Q: And have you provided a similar service for any other student groups at ISU? A: Any other student groups? I don't think so, but I have edited a lot of students' correspondence and sent it back to them." P. App. 194. Further, Plaintiffs' statement omits the fact that Lukan's original correspondence on this subject was to Leath directly, hence Leath's involvement. P. App. 393.

75. **Qualify.** The "revisions" were to add the words "Student Chapter" somewhere on the design in accordance with Trademark and Licensing policies. P. App. 297.

76. **Qualify.** Deny the characterization of "special procedures"; but admit the design was preliminarily reviewed by Hill, Leath, and Madden at Zimmerman's request. P. App. 281-293.

77. **Qualify.** Zimmerman did not say "that the University required preliminary approval from Madden and Hill before submitting the designs to the Trademark Office," she said "I would need to run them by Senior VP Hill and Madden." P. App. 299.

78. **Qualify.** The designs were sent to Hill for preliminary review and comments. P. App. 300-305.

79. **Admit.** Admit the three designs each had a cannabis leaf next to the ISU trademark.

80. **Admit.**

81. **Deny.** The cited portion of the appendix says nothing about NORML ISU's motive, and in the email Zimmerman wrote "please note that there are "NORML" logos that do not have a marijuana leaf included." P. App. 374.

82. **Qualify.** The concern with NORML ISU's group Facebook page was it had the "I State" logo, a registered trademark, next to a cannabis leaf and NORML's logo. P. App. 279.

83. **Admit.**

84. **Qualify.** Zimmerman approved the design after speaking with Hill. P. App. 324.

85. **Qualify.** It was Dr. Eric Cooper, not NORML ISU, that submitted the designs. P. App. 28. Also, the cited portions of Furleigh's deposition do not support the proposition.

86. **Admit.**

87. **Admit.**

88. **Admit.**

89. **Admit.**

90. **Admit.**

91. **Admit.**

92. **Qualify.** Since July 1, 2010 or before, the Student Organization Recognition Policies have used recognition categories--sponsored, affiliated, or registered--to establish the privileges and responsibilities for each type of student organization based on the student organization's mission and relationship to the university. D. App. 84, 90.

93. **Admit.**

94. **Admit.**

95. **Admit.**

96. **Admit.**

97. **Admit.**

98. **Admit.**

99. **Admit.**

100. **Admit.**

101. **Admit.**

102. **Admit.**

103. **Admit.**

104. **Admit.**

105. **Admit.**

106. **Admit.**

107. **Admit.**

108. **Admit.**

109. **Admit.**

110. **Qualify.** Leath says, "Because someone has an objection or is offended by one of the organizations is certainly not a reason to change the policy. It might be -- if there was enough controversy, might be a reason to study the policy." He further states that the policy being changed is not "strictly related to NORML."

111. **Deny.** The cited portion of the appendix does not support this general proposition; Hill's answer was in response to a question about a specific t-shirt; Madden was questioned in the abstract about the difference between advocating for a change in the law and advocating for an illegal action.

112. **Deny.** Read properly, Zimmerman was responding to designs that placed ISU's trademarks next to a cannabis leaf as an illegal drug, thus allowing the university's "name to be tied to a 'dangerous and illegal' substance", to which Zimmerman said, "using it does have a certain sensationalism." P. App. 230, 376. Further, Zimmerman's comments were in response to a design that coyly highlighted "ISU MARIJUANA LEGALIZATION" with a large cannabis leaf and relegated "NORML" to a smaller, darker font that blended in against the dark t-shirt color in the design (Plaintiffs might have referred to this design as "T-Shirt Design #4" had they not omitted it from their record). D. App. 279.

113.  **Deny.**  Deny the characterization of "restrictive actions targeting NORML ISU"; admit Defendants' actions were taken to avoid confusion about the university's position.

114.  **Deny.**  Hill did not make this distinction, and the cited portion of the appendix does not support Plaintiffs' characterization, which self-servingly conflates Hill's discussion of "political groups" with "political positions… getting the institution in the middle…".  P. App. 384-385.

115.  **Deny.**  Plaintiffs' characterization of the article being "treated as a big deal" is inaccurate, unattributed, and not supported by the portion of the appendix to which it cites.  The quoted portion of Leath's testimony related to the Archery Club, not NORML ISU, as seen on page 46 of his deposition which was omitted from Plaintiffs' appendix.  D. App. 429.  The article generated forty-nine comments online, and multiple inquiries from the public, media, and public officials.

116.  **Deny.**  Plaintiffs appear to mischaracterize the testimony here as a "response" to the article, when in fact the testimony was in response to Plaintiffs' counsel's question, "What aspect of those shirts in your opinion promoted illegal drug use?"  P. App. 185.  The follow up question and answer provides further context, "Q: Does it suggest too close of an association if you simply have your logo with the acronym NORML? A: You know, I don't know and I'd have to think about that and review it.  The marijuana leaf certainly did."  P. App. 186.

117.  **Qualify.**  This is not an accurate quote, however the Trademark Guidelines have been applied to only permit ISU trademarks to be used in conjunction with the full student group name.

Respectfully submitted,

**THOMAS J. MILLER**
Attorney General of Iowa

**/s/ TYLER M. SMITH**
**TYLER M. SMITH**
**GEORGE A. CARROLL**
Assistant Attorney General
Hoover Building, Second Floor
1305 East Walnut Street
Des Moines, Iowa  50319
PHONE:  (515) 281-8330
FAX:  (515) 281-7219
E-MAIL:  tyler.smith@iowa.gov
E-MAIL:  george.carroll@iowa.gov
ATTORNEYS FOR DEFENDANTS

*Original filed electronically.*

*Copy electronically served on all parties of record.*

**PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon each of the persons identified as receiving a copy by delivery in the following manner on September 10, 2015:

☐ U.S. Mail     ☐ FAX
☐ Hand Delivery    ☐ Overnight Courier
☐ Federal Express   ☐ Other
☒ ECF System Participant (Electronic Service)

Signature: /s/CHELSEY RICHE