IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| PAUL GERLICH and ERIN FURLEIGH, <br><br>     Plaintiffs, <br><br> vs. <br><br> STEVEN LEATH, WARREN MADDEN, <br> THOMAS HILL, and LEESHA ZIMMERMAN, <br><br>     Defendants. | **No. 4:14-cv-00264 – JEG** <br><br> **O R D E R** |

This matter comes before the Court on a Motion for Summary Judgment filed by Defendants Steven Leath (Leath), Warren Madden (Madden), Thomas Hill (Hill), and Leesha Zimmerman (Zimmerman), which Plaintiffs Paul Gerlich (Gerlich) and Erin Furleigh (Furleigh) resist, and a cross-Motion for Summary Judgment filed by Plaintiffs, which Defendants resist. A hearing on both Motions was held on November 18, 2015. Attorney Robert Corn-Revere was present representing Plaintiffs, and attorney Tyler Murray Smith was present representing Defendants. The Motions are fully submitted and ready for consideration.

## I.   BACKGROUND

### A.   Factual Background[1]

#### 1.   The Parties

Iowa State University (ISU or the University) is a state institution of higher education governed by the Iowa State Board of Regents. Plaintiffs Paul Gerlich and Erin Furleigh are residents of Ames, Iowa, and students at ISU. NORML ISU is the ISU student chapter of the National Organization for the Reform of Marijuana Laws (NORML), a political group that

---

[1] Substantial portions of the material background are adopted from the parties' Joint Stipulated Statement of Material Facts. ECF No. 46. Other facts here are either undisputed or viewed in the light most favorable to the nonmoving party. See Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).

advocates for reform of federal and state marijuana laws.[2]  Gerlich has been a member of NORML ISU since late 2012 or early 2013 and served as the president of NORML ISU. Furleigh has been a member of NORML ISU since the spring of 2012, has served as the group's president, and served as the vice president on the date the Complaint was filed.

At all relevant times, Leath was President of ISU; Madden was Senior Vice President, Division of Business & Financial Affairs responsible for enactment and enforcement of ISU trademark licensing policies; Hill was Senior Vice President for Student Affairs responsible for implementing the Division of Student Affairs' mission and managing the division's personnel and resources; and Zimmerman was Program Director of the Trademark Licensing Office with delegated authority to interpret and implement the ISU's trademark licensing policies, procedures, and guidelines.  The Trademark Office is indirectly supervised by Madden.  It is agreed all Defendants acted under color of state law.

### 2.   ISU Student Groups

ISU encourages students to create student organizations as part of their educational experience.  Since 2012, NORML ISU has been a recognized campus organization at ISU.  The group hosts events to educate the public about its mission to reform marijuana laws, engages in law reform advocacy, participates in university activities to spread awareness of its mission, and engages in community service.

---

[2] On this record, and fundamental to the Court's analysis, the student and national organizations advocate for a change in the law, not the violation of existing law.

### 3.   ISU Trademark Licensing

ISU owns federally registered trademarks, including word marks such as "Iowa State University," "Iowa State," "ISU," "Cyclone," and "Cy," as well as logos, such as Cy the Cardinal (Cy) graphics and Cy the mascot.  ISU student and campus organizations may use ISU's trademarks, including "ISU," "Iowa State University," and other marks, consistent with their recognized status with the University, if the Trademark Office determines that their use complies with the University's licensing guidelines.  The licensing guidelines were approved in 1996 and revised in 2001, 2004, 2005, and 2011.  The guidelines state that designs using ISU marks "must . . . appropriately portray the image of Iowa State University," that an ISU "[m]ark cannot be incorporated into or dominated by the marks of others," and that "[n]o products considered dangerous or offensive will be approved, including but not limited to products . . . promoting firearms, drugs, alcohol, gambling, gaming or tobacco."  Licensing Program Guide-lines, D. App. 65-66, ECF No. 48-8.  The Trademark Office will not license ISU marks for certain items it considers a liability risk or as inappropriately portraying the University's image, including sex toys, alcohol products, ashtrays, condoms, drug-related items, weapons, knives, toilet paper, and diapers.  There are no penalties for student organizations that submit trademark licensing requests that are rejected.

The Trademark Office licenses ISU marks to recognized student organizations that espouse controversial ideas, activities, or lifestyle choices without the assumption that the University supports or endorses any of those ideas, activities, or lifestyle choices.  Defendants acknowledge that licensing a trademark to a student group does not mean that ISU takes a position on what the group represents.

The record includes illustrations of groups and related issues that some may view as controversial.  The Trademark Office has approved designs submitted by CUFFS, a sexual bondage student club and recognized student organization at ISU, to license University marks on their apparel.  ISU's recognition of CUFFS as a student group was controversial, as was CUFFS' use of the University's marks.  Consistent with Defendants' view that licensing a mark does not imply ISU's endorsement, neither Madden nor Hill believed licensing the marks to CUFFS demonstrated University support for sexual bondage or other expressions of alternative sexuality.  Trademark Office has also approved designs by the LGBTAA, a recognized student organization that supports the rights of gay, lesbian, bisexual, and transgender people, which Madden did not view as an endorsement of the group's views.

In addition to designs for CUFFS and LGBTAA, the Trademark Office has approved designs for groups including: Iowa State University Students for Life, an anti-abortion group; ISU College Republicans; Iowa State Democrats; ISU Tea Party; the Navy Marine Corps Drill Team, including designs with Cy the Cardinal holding a rifle; the American Society of Biosystem Engineers, including designs with Cy the Cardinal holding a sword; the Iowa State University Fencing Club, including designs with Cy the Cardinal leaning on an epee; the Rifle and Pistol Club; and the ISU Trap and Skeet Club, including designs with Cy the Cardinal holding a shotgun.

### 4.   NORML ISU T-Shirt Design #1

In October 2012, NORML ISU submitted a design (T-Shirt Design #1) to the Trademark Office that displayed the name of the organization on the front, with the "O" in "NORML" represented by the head of the ISU mascot, Cy the Cardinal.  The shirt's back read "Freedom is

NORML at ISU" with an image of a small cannabis leaf above "NORML." The group planned

to use the shirts for publicizing their message and fundraising. Plaintiffs and fellow NORML

ISU members believed including Cy the Cardinal on the shirt would attract other students and

alumni to the group's political cause and that the combination of Cy and a cannabis leaf

(routinely used by the national organization) made the shirt more marketable and recognizable.

The Trademark Office approved T-Shirt Design #1 for production and sale.

### 5. November 19, 2012, <u>Des Moines Register</u> Article

On November 19, 2012, a front page article appeared in the <u>Des Moines Register</u>

discussing the legalization of marijuana (the Article). The Article focused on recent political

activities pertaining to marijuana legalization, including ballot initiatives and petition drives, and

included a statement by NORML ISU's then-president, Josh Montgomery, that NORML ISU

had received support from ISU. In the Article, Montgomery was pictured wearing the organiza-

tion's T-Shirt Design #1. At 8:11 a.m. that morning, John McCarroll (McCarroll), head of ISU's

public relations office, asked Zimmerman for information about the approval of T-Shirt Design

#1 in case he received calls about the Article. At 8:50 a.m., Zimmerman gave McCarroll a pre-

pared statement that included the following response to Montgomery's assertion that ISU had

given support to NORML ISU:

> The university's Trademark Policy and Student Use Guidelines allow officially recog-
> nized student organizations the ability to use Iowa State's trademarks as long as they
> observe the proper procedures and follow specified design standards. Groups, including
> NORML, may use any of the university's indicia (names, graphics, logos, etc.) as long
> as they seek review and approval from the Trademark Licensing Office, which they did
> for the T-shirts. This does not mean that we take a position on what any of the
> organizations represent. We have 800 groups from The ISU Line Dancer's, CUFFS, the
> ISU Baseball Club, LGBTAA, John Paul Jones Society, Game Renegades, ROTC, and
> many more. I believe that the statement in the article indicating "his group has gotten

nothing but support from the university" is a bit misleading.  He may be confusing recognition of the group as the university "supporting" it.

11/19/2012 Email, Pls. Dep. Ex. 67, J. App. 105-107, ECF No. 46-1.  At 8:57 a.m., McCarroll replied to Zimmerman, stating in part, "Thanks, that's what I was looking for.  I wasn't questioning their rights as a student organization, just wanting to know about the process."  Id.. Later that morning, Leath's office was contacted by Brad Trow (Trow) from the Iowa House Republican Caucus Staff, who asked whether ISU had approved NORML ISU's use of ISU marks on the t-shirt pictured in the Article.  Madden reported to Hill, Zimmerman, and other ISU administrators, including ISU counsel Paul Tanaka (Tanaka) and Keith Bystrom, that they were "getting some push back regarding the Register article," and that the issue was to be discussed at an upcoming meeting.  Id.

That afternoon, Leath asked his Chief of Staff Miles Lackey (Lackey) whether the University could "revoke" permission for T-Shirt Design #1 "without more damage."  11/19/2012 Email, Pls. Dep. Ex. 72, J. App. 138, ECF No. 46-2.  Lackey sent Leath the following response for Trow's inquiry, which Leath approved:

> The university's current Trademark Policy and Student Use Guidelines allow officially recognized student organizations the ability to use Iowa State's trademarks as long as they observe the proper procedures and follow specified design standards.  Groups, including NORML, may use any of the university's indicia (names, graphics, logos, etc.) as long as they seek review and approval from the Trademark Licensing Office, which they did for the T-shirts.  This does not mean that we take a position on what any of the organizations represent.  We have 800 groups from The ISU Line Dancer's, CUFFS, the ISU Baseball Club, LGBTAA, John Paul Jones Society, Game Renegades, ROTC, and many more.  Trademark believes that the statement in the article indicating 'his group has gotten nothing but support from the university' is misleading.  He may be confusing recognition of the group as the university 'supporting' it.  In response to this issue, President Leath is direct-ing senior administrative staff to review the current policy and provide him with recommendations to improve the trademark approval process by the end of the year."

11/19/2012 Email, Pls. Dep. Ex. 71, J. App. 167, ECF No. 46-2.

Leath was concerned that the Trademark Office had not been sensitive to public percep-

tions of NORML ISU.  Leath explained, "there are some issues that are clearly going to cause

controversy and it's better to manage them on the front end.  I would have expected them to do

that, not necessarily change what they did or how they did it."  Leath Tr. 128:13-18, P. App. 160,

ECF No. 47-4.  Leath felt ISU administrators "should be very sensitive to how people perceive

the things we do in and around campus" and relied on Lackey's judgment "because he worked

on Capitol Hill for years and got up every day and thought about how people outside campus

would perceive the things we're doing."  Leath Tr. 126:12-15, P. App. 158, ECF No. 47-4.

Leath stated that "it would be unwise, it would be just foolish not to have a close working

relationship with the top government official when you're a government entity."  Id.  Regarding

the reaction to the Article, Leath said, "my experience would say in a state as conservative as

Iowa on many issues, that it was going to be a problem."  Leath Tr. 124:17-19, P. App. 157, ECF

No. 47-4.  By the end of November 20, 2012, Leath's public email address had received two

emails from the public concerning the Article, and the University Relations public email address

had received one public comment.

Around November 21, 2012, Steve Lukan (Lukan), Director of the Governor's Office for

Drug Control Policy, called Leath's office to ask how ISU would respond to the Article and how

ISU would change its trademark approval policies.  Lackey felt the existing guidelines had been

interpreted inappropriately to approve T-Shirt Design #1 and recommended revising the guide-

lines to prevent licenses for student group designs that promote drugs or alcohol.

### 6.  November 26, 2012, President's Cabinet Meeting

On November 26, 2012, Leath, Lackey, Hill, Madden, Tanaka, McCarroll, and other senior

administrators attended a President's cabinet meeting whose agenda included discussion of

NORML ISU's T-Shirt Design #1 and revisions to the trademark policies.  Neither Hill nor

7

Madden knew the nature of any public complaints about NORML ISU, how many had been received, or who submitted them, but they were aware there had been some kind of political push-back and agreed the policy needed to be reviewed.  The attendees voiced concern that NORML ISU's use of University logos would be understood as endorsement of the group's political message.  Discussion of the trademark policy revisions lasted only ten to fifteen minutes, and Leath recalled no actual deliberation:  "[I]f there was a discussion it was extremely brief.  It was more like, 'Yeah, everybody gets it.  Go fix it.'"  Leath Tr. 35:11-13, P. App. 145, ECF No. 47-4.  Madden instructed Zimmerman to consult with him before approving any NORML ISU reorders that included T-Shirt Design #1 but did not instruct her to hold approvals for any other campus group.

### 7.    Submission of NORML ISU Request to Reorder for T-Shirt Design #1

On November 24, 2012, NORML ISU reordered shirts with T-Shirt Design #1.  As Madden had instructed, Zimmerman emailed Madden, University counsel, and Lackey that she had received the request and that it would not be processed until she had been instructed to do so.  Zimmerman could not think of any other examples of student reorder requests that had been placed on hold during her tenure as Director of the Trademark Office.

### 8.    November 29, 2012, Meeting

After the Article was published, Madden investigated whether NORML ISU met the qualifications for recognition as a student organization.  Madden found that the group's advisor was an ISU custodian, which violates ISU's group recognition standards, and Madden relayed this information to Hill.  While NORML ISU's reorder was pending, Madden, Hill, Furleigh, and other members of NORML ISU convened at a meeting.  Madden and Hill told the group that NORML ISU's use of ISU's trademark depicted in the Article caused confusion about whether

ISU supported the legalization of marijuana and that T-Shirt Design #1 did not conform with the University's licensing policies and needed to be changed. The administrators told the students that members of NORML ISU would henceforth need preapproval from Hill or Madden before submitting designs to the Trademark Office. Of the approximately 800 student groups at ISU, the restrictions including the prior review procedure applied only to NORML ISU. Madden and Hill also informed the students that their advisor could no longer hold his position for the group, which meant that, if he were not replaced, NORML ISU would lose its status as a recognized student group. Hill informed the students that he was willing to serve as NORML ISU's interim faculty advisor in order, according to Lackey, to avoid giving the group "any ammunition from complaining." 12/02/2012 Email, Pls. Dep. Ex. 79, P. App. 383, ECF No. 47-6. According to Madden, Hill offered to serve as the group's advisor so NORML ISU could remain a recognized group.

After the meeting, Hill told NORML ISU's members that he would not find any design acceptable that had Cy or any other ISU marks alongside a cannabis leaf, and Madden instructed Zimmerman not to approve NORML ISU's request to reorder additional shirts using T-Shirt Design #1. NORML ISU's reorder request using the design was rejected December 3, 2012.

Although the Trademark Office is not tasked with reviewing student group flyers and leaflets, Zimmerman, believing all of NORML ISU's material was now subject to prior review, reviewed a NORML ISU flyer and reported to Hill that it included a cannabis leaf graphic. Zimmerman also fact-checked the flyer's claim that NORML ISU was ISU's largest student-run organization and questioned the use of ISU logos on NORML ISU's website. Zimmerman saw NORML ISU's designs as sensational, offensive, and contrary to societal norms, and criticized

NORML ISU's political advocacy, arguing that the designs did not further NORML ISU's political cause and that marijuana is not socially acceptable.

### 9.   Hill's Status as NORML ISU's Advisor

In February 2013, Associate Professor of Psychology Eric Cooper (Cooper) became NORML ISU's permanent faculty advisor, but Hill nonetheless remained the group's interim advisor.  NORML ISU discussed several times whether to remove Hill, but the group never took action.  Since the group needed Hill's approval of its designs, the group argues it doubted whether it would be wise to remove Hill as the group's advisor.  Ultimately, NORML ISU decided it was in the club's best interest not to ask Hill to step down.

### 10.   NORML ISU Communications With Steven Lukan

On February 17, 2013, Josh Montgomery sent an email to Lukan inviting him to an "Iowa Marijuana Law Reform Awareness Event" planned by NORML ISU.  Days later, Lukan contacted Leath to express concern that ISU trademarks were being used to advocate for the legalization of marijuana.  At Leath's direction, Hill immediately scheduled a meeting with Montgomery, which Furleigh attended.  At the meeting, Hill advised Montgomery that the tone of his email to Lukan had been inappropriate, and he recommended that Montgomery draft an apology to Lukan for Hill's approval.  Montgomery sent Hill his draft apology later that day, and Hill forwarded the draft to Leath for review.  Montgomery sent the email to Lukan and later apologized to Furleigh for the initial message to Lukan, which Montgomery described as disrespectful.

### 11.   Revision of Trademark Guidelines

On January 16, 2013, the ISU Trademark Guidelines were revised to include a new Section 6e to clarify that ISU marks could not be used to suggest promotion of certain items, including

illegal drugs, and to state under Section 3d that ISU's name and marks could not be used to

imply support or endorsement of a particular position on matters of public concern.  Section 6e

provides as follows:

> No designs that use University marks that suggest promotion of the below listed items
> will be approved: dangerous, illegal or unhealthy products, actions or behaviors; fire-
> arms and weapons in a manner which is illegal, dangerous, harmful or destructive to
> humans; drugs and drug paraphernalia that are illegal or unhealthful; alcohol consump-
> tion in an illegal or unhealthful manner, or which is inconsistent with University policy
> and programs; gambling/gaming; sexual conduct, imagery, inferences or adult industry
> paraphernalia; or tobacco products or tobacco usage.

02/25/2002 Guidelines for Univ. Trademark Use by Student and Campus Orgs., Pls. Dep. Ex. 17,

J. App. 228, ECF No. 46-2.

The revisions also restricted the use of ISU trademarks for certain classes of ISU student

groups.  Recognized student organizations at ISU, including NORML ISU, are subject to the

University's student organization policies, which categorize groups into tiers.  The student group

tiering system gave "sponsored" organizations permission to use ISU logos, including Cy the

Cardinal, but allowed only limited use to "recognized" student organizations, including NORML

ISU.  The January 16 revisions provided that student organizations in the "registered" tier would

not be permitted the use of ISU logos, as opposed to word marks.

### 12.  Requests For Clarification of Trademark Policies

On February 12, 2013, after the trademark guideline revisions, the Trademark Office

approved a NORML ISU t-shirt design that said "NORML ISU" across the front and "We are

NORML" across the back.  The ISU Trademark Office later approved a t-shirt design with the

text "NORML ISU Student Chapter."  Around March 8, 2013, members of NORML ISU

submitted three more designs to Hill for preliminary review that included cannabis leaf graphics

as well as political slogans.  Hill informed Montgomery that the three designs were not accep-

table and that the cannabis leaf graphic could not be used.  A cannabis leaf graphic is part of a

logo for the national NORML organization.  Hill required further changes to NORML ISU's

group Facebook page, including removal of a NORML graphic with a cannabis leaf.

In 2014, NORML ISU submitted numerous t-shirt designs to the Trademark Office to test

which designs would be approved under the revised trademark guidelines.  One design included

"NORML" superimposed over "ISU" with the subtext "National Organization for the Reform of

M******** Laws."  Zimmerman rejected the design, stating the asterisks needed to be replaced

by the word "Marijuana." Another design included a "Punching Cy" logo with the text "NORML:

It's Not For Everyone But It's Not a Crime."  Zimmerman rejected the design, stating,

> The use of mascot graphics is not allowed per your tier level with Student Activities
> Center.  However, the 'Punching Cy' logo was retired in 2010 and no longer allowed
> to be used by anyone (both internal & in retail) . . . .  In addition, the language is also
> unacceptable.  Use of marijuana in the state of Iowa is still a crime and it is still a crime
> on the federal level as well.  I would suggest you use a statement in line with your
> mission (working to reform marijuana laws).  Please resubmit with changes.

Pls. Dep. Ex. 55, P. App. 332-333, ECF No. 47-6.  NORML ISU later submitted a design

including an image of a THC molecule, which Zimmerman rejected, stating that she had con-

ferred with a chemistry teacher and determined the molecule was incorrectly depicted.  The

group then submitted a design with a block of text repeating the letters "NORMLISU" in

variegated ink color to produce a silhouette of a cannabis leaf.  The same day, Zimmerman

rejected the design, stating that the depiction of the cannabis leaf violated the trademark guide-

line prohibiting licenses for designs that "suggest promotion" of "dangerous, illegal or unhealthy

products, actions or behaviors; drugs and drug paraphernalia that are illegal or unhealthful."  Pls.

Dep. Ex. 61, P. App. 344-345, ECF No. 47-6.

Madden acknowledged to Cooper that the January 16, 2013, revisions to the ISU Trademark Guidelines were made as a result of external criticism, including observers' perceptions that ISU supported NORML ISU's advocacy for marijuana law reform. Plaintiffs' perceived that NORML ISU was being treated differently than other groups, and Defendants' two-stage review policy led to uncertainty about how to obtain approval for t-shirt designs, and caused NORML ISU members to change their designs, and their message, to obtain approval.

### B.  Procedural Background

On July 1, 2014, Plaintiffs filed a Complaint stating claims under 42 U.S.C. § 1983 for alleged violations of their First and Fourteenth Amendment rights. Plaintiffs allege Madden and Zimmerman's actions, endorsed by Leath and Hill, violated clearly established constitutional rights of which reasonable administrators and staff should have known. Count I alleges that Defendants' trademark licensing decisions, as applied to Plaintiffs, violate Plaintiffs' rights to free speech under the First and Fourteenth Amendments. Count II alleges that the Trademark Guidelines are unconstitutionally overbroad in violation of the First and Fourteenth Amendments. Count III alleges that the Trademark Guidelines are unconstitutionally vague in violation the First and Fourteenth Amendments. Count IV requests a declaratory judgment pursuant to 28 U.S.C. § 2201, et seq., that the Trademark Policy is unconstitutional on its face and as-applied violates Plaintiffs' First and Fourteenth Amendment rights, and a permanent injunction pursuant to 28 U.S.C. § 2202 restraining Defendants from enforcing the guidelines on Plaintiffs' expressive activities to the extent they are unconstitutional. On August 17, 2015, Plaintiffs and Defendants filed cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 on all claims.

## II.    DISCUSSION

### A.   Jurisdiction

Because Plaintiffs bring claims under a federal statute, 42 U.S.C. § 1983, concerning the

United States Constitution, this Court has original jurisdiction over Plaintiffs' claims pursuant to

28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising

under the Constitution, laws, or treaties of the United States.").  Venue is proper pursuant to 28

U.S.C. § 1391(b) because the events giving rise to the claims occurred within this District ("A

civil action may be brought in . . . a judicial district in which a substantial part of the events or

omissions giving rise to the claim occurred.").

### B.   Summary Judgment Standard

The Federal Rules of Civil Procedure authorize "motions for summary judgment upon

proper showings of the lack of a genuine, triable issue of material fact."  Celotex Corp.

v. Catrett, 477 U.S. 317, 327 (1986).  "[S]ummary judgment is appropriate where the pleadings,

discovery materials, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to summary judgment as a matter of law."  Kountze ex rel.

Hitchcock Found. v. Gaines, 536 F.3d 813, 817 (8th Cir. 2008) (quoting Hohn v. Spurgeon, 513

F.3d 827, 829 (8th Cir. 2008)).  "The Court does not weigh the evidence, nor does it make

credibility determinations.  The Court only determines whether there are any disputed issues and,

if so, whether those issues are both genuine and material."  Sam's Riverside, Inc. v. Intercon

Sols., Inc., 790 F. Supp. 2d 965, 974 (S.D. Iowa 2011) (citing Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 252 (1986)).  "[T]he substantive law will identify which facts are material . . . .

Factual disputes that are irrelevant or unnecessary will not be counted."  Anderson, 477 U.S. at

248.  Where, as here, there are cross-motions for summary judgment, the Court will evaluate

each of the motions independently to determine whether there exists a genuine dispute of

material fact and whether the movant is entitled to judgment as a matter of law.  Sam's

Riverside, 790 F. Supp. 2d at 975 (citing St. Luke's Methodist Hosp. v. Thompson, 182 F. Supp.

2d 765, 769 (N.D. Iowa 2001).

### C.  Standing

A federal court may not exercise jurisdiction over any case where the plaintiff lacks

standing to sue.  "In essence the question of standing is whether the litigant is entitled to have the

court decide the merits of the dispute or of particular issues.  This inquiry involves both consti-

tutional limitations on federal-court jurisdiction and prudential limitations on its exercise."

Warth v. Seldin, 422 U.S. 490, 498 (1975).  "In its constitutional dimension, standing imports

justiciability:  whether the plaintiff has made out a 'case or controversy' between himself and the

defendant within the meaning of [Article III].  This is the threshold question in every federal

case, determining the power of the court to entertain the suit."  Id.  "To show standing under

Article III of the U.S. Constitution, a plaintiff must demonstrate (1) injury in fact, (2) a causal

connection between that injury and the challenged conduct, and (3) the likelihood that a favor-

able decision by the court will redress the alleged injury."  Young Am. Corp. v. Affiliated

Comput. Servs. (ACS), Inc., 424 F.3d 840, 843 (8th Cir. 2005) (citing Lujan v. Defs. of Wildlife,

504 U.S. 555, 560-61 (1992)).  Defendants dispute whether Plaintiffs have been injured in fact,

arguing NORML ISU, rather than Plaintiffs in their individual capacities, suffered Defendants'

alleged viewpoint discrimination.

The essence of standing's injury requirement is that a plaintiff must "allege such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional issues."  Baker v. Carr, 369 U.S. 186, 204 (1962).  The court must assess whether the injury "affect[s] the plaintiff in a personal and individual way," Lujan, 504 U.S. at 560, and ensure that a plaintiff's injury is not so abstract as to make the claim incapable of, or otherwise not suitable for, judicial resolution.  It is axiomatic, and illustrated by the discussion infra, that these abstract principles must be applied as necessitated by the unique circumstances of a given case.

Defendants argue with respect to the rejection of NORML ISU's t-shirt designs that it was NORML ISU, not Plaintiffs, that submitted the rejected t-shirt designs.  On this record, the Court cannot agree the issue can be so narrowly framed.

Of course, the entity "NORML ISU," which is an abstraction – the moniker for an array of individual students – took no action at all.  The agents that act in the name of NORML ISU are individual students, human beings who attend meetings, order t-shirts, send emails, and engage in political advocacy of their own which typically concurs with that of the organization.  When Defendants argue that the rejected t-shirt designs could not have injured Plaintiffs because there is no individual right or privilege to be injured, they ignore the reality that NORML ISU is a political association of individual students with expressive rights that are enhanced, not diminished, by their association with one another.  See, e.g., Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson, 357 U.S. 449, 460 (1958) ("It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause . . . which embraces freedom of

speech.") (citing <u>Gitlow v. New York</u>, 268 U. S. 652, 666 (1925)).  In this case, Plaintiffs have shown injuries by demonstrating that they were not allowed to produce, wear, and sell their desired t-shirts for raising awareness of their cause and that ISU administrators put unique burdens on both their and the group's political expression.  Plaintiffs were active members of NORML ISU who led the organization at relevant times.  Even if it were not specifically Plaintiffs that emailed the t-shirt designs to the Trademark Office, their expressive activities as members of the group were diminished when the designs were rejected.  That Plaintiffs incurred their injuries under the banner of NORML ISU does not mean their injuries are not cognizable under the First Amendment.

      In support of their argument that Plaintiffs lack standing as individuals, Defendants cite <u>Gilles v. Davis</u>, 427 F.3d 197, 208 (3d Cir. 2005), in which the Third Circuit found that members of a group lacked standing to challenge a university's permit policy applicable to the group.  The facts of <u>Gilles</u> are significantly different from this case.  In <u>Gilles</u>, the plaintiffs lacked standing to challenge the university's permit policy because they had never actually applied for a permit and therefore could not demonstrate that the policy ever harmed them.  <u>Id.</u> at 208.  Therefore, the court rejected plaintiffs' argument that "they personally suffered some actual or threatened injury as a result of [the university]'s permit policy or the application of that policy."  <u>Id.</u>  The court reasoned in that case the third-party exception to traditional standing principles did not extend standing to the plaintiffs because the university's permit policy "d[id] not unduly restrict First Amendment freedoms, nor d[id] it deter third parties from engaging in protected expression."  <u>Id.</u> Even were this Court persuaded by the determination in <u>Gilles</u>, it is distinguishable from these facts because NORML ISU members, including Plaintiffs, were placed under unique scrutiny following a complaint from the Republican Caucus Staff, were denied the ability to reorder T-

Shirt Design #1, were affected by ISU's trademark policies when the group submitted designs according to the method prescribed by the policies, and had the designs rejected purportedly under the policies.  Therefore, <u>Gilles</u> does not support Defendants' argument that Plaintiffs lack standing in this case.

Nor does <u>Romsted v. Rutgers State University of New Jersey</u>, Civil Action No. 12-5588 (MAS) (LHG), 2013 WL 3964516 (D.N.J. July 31, 2013), support Defendants' position.  In <u>Romsted</u>, the Rutgers chapter of Students for Justice in Palestine hosted a fundraiser and received donations from several students unaffiliated with the group.  <u>Id.</u> at *1.  Rutgers then prohibited the student group from sending the collected funds to an independent organization that Rutgers believed supported terrorists; instead, the collected funds were provided to an alternative beneficiary organization.  <u>Id.</u>  Donors dissatisfied with the alternative beneficiary organization filed a lawsuit against Rutgers seeking, among other things, to have Rutgers release the donated funds to the plaintiffs' chosen organization and to enjoin Rutgers from future viewpoint discrimination.  <u>Id.</u> at *3.  The district court determined that the plaintiffs unaffiliated with the student group lacked standing to challenge the university's decision because they were not members of the group affected by the decision, they knew before donating the funds that a fundraising beneficiary had not yet been determined, they could have requested a refund, and they did not have a property interest in the full amount of collected donations.  <u>Id.</u> at *3-4.  The <u>Romsted</u> court further reasoned that the plaintiffs could not show they had been injured by the university because the alternative beneficiary organization was selected by the student group to which the plaintiffs donated.  <u>Id.</u> at *4.  Again, the facts of this case differ materially.  Unlike the plaintiffs in <u>Romsted</u>, Plaintiffs in this case *are* members of NORML ISU, the group subject to university action.  Furthermore, Plaintiffs contend that ISU changed its policies to target their

group and applied the policies to them in a discriminatory manner, which is not analogous to the plaintiffs' relationship to Rutgers' challenged actions in Romsted.

Defendants also cite Commissioned II Love v. Yarbrough, 621 F. Supp. 2d 1312 (S.D. Ga. 2007), in which the court determined on a motion to dismiss that a faith-based student group's president had standing to bring a First Amendment claim against university officials who suspended and ultimately expelled her group from campus due to its members' religious practices but found that other officers in the group lacked standing. The court reasoned that because the school suspended the student group for actions that the group's president engaged in as an individual, the group's president had alleged facts sufficient to state a claim. Id. at 1320. The court found that another group member plaintiff, however, had only alleged injuries due to the student organization being precluded from meeting and praying and therefore was not harmed by the expulsion of the particular group from campus. Id. at 1319 (noting that although as an organization the student group was prohibited from meeting and praying, "the other members were theoretically free to assemble and pray if they wished to do so").

Although cited by Defendants, Commissioned II Love demonstrates that a member of a student group (in that case, the group's president) is not precluded from suing in an individual capacity for injuries personally suffered while a member of a student group. In Commissioned II Love, the reason some of the group members lacked standing to challenge the university's action was that their individualized interests as group members were not affected by the university's challenged conduct. The circumstances that foreclosed standing to Commissioned II Love's other members are therefore distinguishable from this case, because unlike the members in Commissioned II Love, whose only asserted injury was being denied group prayer, individual NORML ISU members all share the same type of interest: political speech and advocacy.

19

Pivotally, even to the extent one could argue this case is factually analogous to Commissioned II Love, the procedural posture of that case distinguishes it from the instant case.  Commissioned II Love was considered on a motion to dismiss, where a court may not consider the record to determine a plaintiff's injury.  See City of Clarkson Valley v. Mineta, 495 F.3d 567, 570 (8th Cir. 2007) ("[W]hen a motion to dismiss is made on standing grounds the standing inquiry must, as a prerequisite, be done in light of the factual allegations of the pleadings.") (citing Lujan, 504 U.S. at 561).  Here, on the other hand, the Court may look to evidence in the record to determine, as it has, that Plaintiffs have been injured individually by Defendants' acts.  See Ark. ACORN Fair Hous., Inc. v. Greystone Dev. Co., 160 F.3d 433, 434 (8th Cir. 1998) ("At the summary judgment stage, '[t]he party invoking federal jurisdiction bears the burden of establishing' injury in fact by alleging specific facts that taken as true demonstrate the plaintiff suffered 'distinct and palpable injuries that are "fairly traceable"' to the defendant's actions.") (quoting Lujan, 504 U.S. at 561).

Several of the most significant cases addressing First Amendment rights in the university context demonstrate that students have standing to sue based on injuries suffered in their capacity as student group members.  In Widmar v. Vincent, 454 U.S. 263, 265-66 (1981), individual members of a registered student organization brought an action alleging discriminatory application of a university regulation that prohibited the student organization from using space on campus for religious worship and discussion.  Similarly, in Rosenberger v. Rector & Visitors of the University of Virginia, 515 U.S. 819, 825-27 (1995), when the university denied funding for a recognized student group's publication on the grounds that the publication discussed issues from a Christian perspective, individual members of the student group brought a § 1983 action against the university for viewpoint discrimination in violation of their First Amendment rights.

As discussed above, the fundamental question to determine Plaintiffs' standing is whether Plaintiffs suffered injuries in their individual capacities as members of NORML ISU.  On this record, the Court finds that requirement is satisfied here.  Each Plaintiff served as president of the organization at material times.  Cf. Moore v. Watson, 738 F. Supp. 2d 817 (N.D. Ill. 2010) (conferring standing to a former editor-in-chief of a censored student newspaper for injuries he thereby suffered as an individual).  The record shows that each active member of NORML ISU, including Plaintiffs, suffered viewpoint discrimination by Defendants, because Defendants' rejection of the group's t-shirt designs hindered each member's ability to spread NORML ISU's message in the way they thought best.  Gerlich felt it was essential to include images of cannabis leaves, as does the national organization, and ISU marks on the group's designs because doing so enhanced the group's ability to market itself in the campus community and to gain credibility with students, which was important to spreading his political message and attracting new members.  Defendants' assertion that Plaintiffs lack standing to sue for Hill's involvement with the group, including Hill's intervention regarding Montgomery's email to Lukan, is also misplaced.  On these facts, Hill's involvement in the group's activity presents as part of a larger pattern of practices that impacted the group's political advocacy and chilled future speech for fear of University reprimands.

Plaintiffs also have standing to assert that Defendants' revised trademark guidelines are unconstitutionally overbroad.  "With regard to a First Amendment facial overbreadth claim, actual injury can exist for standing purposes even if the plaintiff has not engaged in the pro-hibited expression as long as the plaintiff is objectively reasonably chilled from exercising his First Amendment right to free expression in order to avoid enforcement consequences." Republican Party of Minn., Third Cong. Dist. v. Klobuchar, 381 F.3d 785, 792 (8th Cir. 2004).

Mere "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm . . . ." <u>Laird v. Tatum</u>, 408 U.S. 1, 13-14 (1972). "'The party invoking federal jurisdiction bears the burden of establishing' injury in fact by alleging specific facts that taken as true demonstrate the plaintiff suffered 'distinct and palpable injuries that are "fairly traceable"' to the defendant's actions." <u>Ark. ACORN Fair Hous., Inc.</u>, 160 F.3d at 434 (quoting <u>Lujan</u>, 504 U.S. at 561). Here, the record demonstrates Furleigh felt her speech was disfavored by ISU officials because Hill, an ISU administrator and eventually the group's advisor, laughed at her when she tried to defend the group's shirt designs. She felt intimidated and that her views and her political advocacy did not matter under ISU policies. Plaintiffs felt deterred from engaging in advocacy because Defendants made them feel the group was misrepresenting the University, and Defendants' conduct caused Plaintiffs to change their apparel designs, and their message, to obtain Defendants' approval. On this record, the Court concludes Plaintiffs therefore have standing to challenge the trademark guidelines as unconstitutionally overbroad.

Finally, Defendants argue Plaintiffs' lack standing to challenge the revised trademark guidelines because the guidelines regulate trademark licensing, not speech, and because the students' expressive activity was not entirely proscribed by the guidelines. Defendants' argument is flawed because it is a regulation's deterrent effect on protected expressive conduct, rather than its explicit or nominal purpose, that determines the regulation's constitutional validity. This is true of both facial and as-applied challenges. <u>See</u> <u>Virginia v. Hicks</u>, 539 U.S. 113, 115 (2003) (addressing an overbreadth challenge of a trespass ordinance); <u>Klobuchar</u>, 381 F.3d at 790 (noting that an otherwise enforceable statute may be unconstitutional as applied to a

particular plaintiff). Therefore, Defendants' professed purpose of the guidelines does not ensure the guidelines pass constitutional muster.

Members of NORML ISU do not forfeit their standing to sue for injuries under the First Amendment by choosing to affiliate with the group; so long as Plaintiffs have suffered injuries in their individual capacities, they have standing to redress their grievances as such. The record indicates Plaintiffs were harmed by Defendants' conduct, and for this reason and the reasons already discussed, Plaintiffs have standing to pursue their claims.

### D. Qualified Immunity

Defendants next argue that Defendants are entitled to qualified immunity from Plaintiffs' claims. Because the doctrine raises the issue of immunity from suit, it is yet another preliminary consideration.

Public officials are entitled to immunity from claims brought against them in their individual capacities if their actions did not violate clearly established law of which a reasonable person in the officials' position would be aware. Pearson v. Callahan, 555 U.S. 223, 231 (2009). Courts have adopted a two-part test for qualified immunity. Jones v. McNeese, 675 F.3d 1158, 1161 (8th Cir. 2012). The first inquiry is whether, taken in the light most favorable to the party asserting injury, the facts alleged demonstrate a violation of a statutory or constitutional right. Id. The second inquiry is whether that right was "clearly established" at the time of the government official's alleged conduct such that it would have been clear to a reasonable person that the conduct was unlawful under the circumstances. Id.

1.    **Viewpoint Discrimination**

a.    **Whether Defendants Engaged in Viewpoint Discrimination**

"Section 1983 imposes liability for certain actions taken 'under color of' law that deprive a person 'of a right secured by the Constitution and laws of the United States.'"  Dossett v. First State Bank, 399 F.3d 940, 947 (8th Cir. 2005) (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 931 (1982)).  Here, Plaintiffs allege the regulation both facially and as applied violated their First Amendment rights.

"[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  Police Dep't of Chicago v. Mosley, 408 U.S. 92, 95(1972) (citing Cohen v. California, 403 U.S. 15, 24 (1971)). Courts have long afforded protection to First Amendment rights of students at public colleges and universities.  See Healy v. James, 408 U.S. 169, 180 (1972) ("[S]tate colleges and universities are not enclaves immune from the sweep of the First Amendment."); see also Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969) ("It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.").

The development of First Amendment doctrine in the university context has repeatedly affirmed that student groups may not be denied benefits on the basis of their espoused views.  In Healy v. James, a student group was barred from forming a recognized chapter of the Students for a Democratic Society, a national organization that advocated leftist politics, because the school disagreed with the group's political activities.  Healy, 408 U.S. at 170-73.  In holding that the college could not deny official status to the group, the Supreme Court stated that "[t]he

24

College, acting here as the instrumentality of the State, may not restrict speech or association simply because it finds the views expressed by any group to be abhorrent." Id. at 187-88.

Similarly in Rosenberger, the Supreme Court held that a public university may not deny student activity funds to a group on the basis of its members' beliefs. Rosenberger, 515 U.S. at 823. There, the University of Virginia was found to have impermissibly withheld student activity funds – made up of mandatory student fees – to a campus group primarily because the group discussed a particular religious view in its newspaper publication. Id. at 826. The university's guidelines on fund distribution prohibited distribution of funds for "religious activity." Id. at 825. Members of the student group challenged the school's actions and guidelines under § 1983 for violating their First Amendment rights to freedom of speech and press. Id. at 827. In holding the university's actions unconstitutional, the Supreme Court explained,

> It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys. Other principles follow from this precept. In the realm of private speech or expression, government regulation may not favor one speaker over another. Discrimination against speech because of its message is presumed to be unconstitutional. These rules informed our determination that the government offends the First Amendment when it imposes financial burdens on certain speakers based on the content of their expression. When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.

Id. at 828-29 (citations and quotations omitted). Viewpoint discrimination is especially danger-ous on university campuses, because "[f]or the University, by regulation, to cast disapproval on particular viewpoints of its students risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses." Id.

The Eighth Circuit has addressed viewpoint discrimination in the college setting in Gay & Lesbian Students Ass'n v. Gohn, 850 F.2d 361, 362 (8th Cir. 1988), in which a University of Arkansas student group that advocated for gay and lesbian rights (GLSA) was denied funding by the university.  The GLSA had met all objective criteria to receive funding, all other groups that met the criteria had received funding, and there was no shortage of available funds.  Id. at 367.  Some members of the student senate, which denied the funds, admitted that they voted against the GLSA receiving funds because of the group's views on homosexuality.  Id.  Further, University officials were pressured by state legislators not to fund the GLSA or to support any opinions tolerant of homosexuality.  Id.  The Eighth Circuit noted that the GLSA did not advocate for any activity that was illegal but rather for a change in the law, and that even if it did advocate for illegal activity, its speech would still be protected by the First Amendment.  Id. at 368.  The Eighth Circuit held the university's denial of funding was a form of viewpoint discrimination in violation of the First Amendment.  Id. ("Conduct may be prohibited or regulated, within broad limits.  But government may not discriminate against people because it dislikes their ideas, not even when the ideas include advocating that certain conduct now criminal be legalized.").

Defendants contend that, through its trademark licensing program, ISU did not establish a public forum that invites First Amendment protections for Plaintiffs' speech, citing Walker v. Tex. Div., Sons of Confederate Veterans, Inc., 135 S. Ct. 2239, 2250 (2015) for the proposition that "[a] government 'does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse'" (quoting Cornelius v. NAACP Legal Def. & Ed. Fund, Inc., 473 U.S. 788, 802 (1985)).  Yet, forum analysis aside, the cases discussed above demonstrate the straightforward principle that a public university may not discriminate among student groups on the basis of their espoused

26

views.  Even assuming Defendants are correct that ISU did not establish a forum for student speech with its trademark licensing program, Defendants would nonetheless be forbidden from denying a license to NORML ISU on impermissible grounds.  In <u>Gohn</u>, confronted with a similar issue, the Eighth Circuit concluded that even if the GLSA had no right to receive university funding at all, it could still not be denied those funds "for a reason which violates its First Amendment rights."  Therefore, under <u>Gohn</u>, even if NORML ISU was not entitled to use ISU marks, be it in a public forum or otherwise, ISU could not deny use of the marks to NORML ISU based on the group's political viewpoint.

Alternatively, Defendants argue that they have not denied NORML ISU a trademark license on the basis of viewpoint because any rejected NORML ISU designs did not conform with ISU's viewpoint-neutral trademark guidelines, and that there is no evidence that they took any action against NORML ISU because of the group's political message.  On this record, the Court cannot agree that Plaintiffs' designs were rejected pursuant to viewpoint-neutral guidelines, which prohibit the use of ISU marks on designs that promote "dangerous, illegal or unhealthy products, actions or behaviors" or promote illegal drugs.  Defendants apparently previously applied the guidelines with flexibility, in one instance allowing designs with guns and swords – which apparently are not dangerous products under the guidelines – and in another instance prohibiting NORML ISU's designs, including designs with cannabis leaves – which presumably run afoul of the guidelines' ban on promoting illegal drugs.  As was made clear in <u>Gohn</u>, there is a crucial difference between promoting an illegal activity and advocating for an activity or substance that is now illegal to be made legal.  Plaintiffs did the latter, advocating for a change in the law, using the iconography of the national NORML organization.  Further, Defendants' assertion that their denials of Plaintiffs' designs were not politically motivated is

unsupported by the record, which shows that Plaintiffs' political message, and a political reaction, was a driving factor behind Defendants' actions.  So motivated, Defendants' conduct resulted in discrimination against Plaintiffs "on the basis of their ideology."  See Gohn, 850 F.2d at 362.

Before the ISU administration was contacted by Lukan and the Iowa House Republican Caucus Staff, Defendants' professed that groups were free to use ISU marks so long as they received approval from the Trademark Office, and that ISU did not endorse any group's views. Once Defendants began receiving pressure from Iowa political figures, though, they immediately took measures to ensure there would be no political controversy over NORML ISU's use of ISU marks.  These actions were naturally predicated on the political content of the group's views. As discussed above, Leath disagreed with the approval of NORML ISU's t-shirt design because it was better to "manage" controversies "on the front end," which suggests Leath thought it best to deny permission to groups with controversial views.  Similarly, Leath felt it was important to be "sensitive to how people perceive things we do" on campus, explaining that he felt it was important to maintain good relationships with government officials.  Thus, when Leath's office was contacted by several Iowa political figures, Defendants took action to preserve those relationships.

Defendants' politically-motivated reaction to these inquiries made it more difficult for Plaintiffs to receive trademark licenses for their designs.  On several occasions, NORML ISU's designs were rejected due to the messages they expressed, with Zimmerman saying the designs were sensational, offensive, and contrary to social norms.  Moreover, NORML ISU's designs were subject to unique administrative scrutiny by Madden and Hill, who were interjected as additional gatekeepers to approval of the group's designs.  The administrative oversight of the

group became all the more intense when Hill became NORML ISU's interim faculty advisor.

Taken together, these circumstances show that Defendants took action specifically directed at

NORML ISU based on their views and the political reaction to those views so that Defendants

could maintain favor with Iowa political figures.  As such, the Court must conclude Defendants'

conduct amounts to discrimination on the basis of Plaintiffs' viewpoint.

"Content-based discrimination can be justified only if the government demonstrates that its

regulation is narrowly drawn and is necessary to effectuate a compelling state interest."  Id. at

366 (citing Widmar, 454 U.S. at 270).  Defendants have not demonstrated a compelling state

interest for engaging in viewpoint discrimination against Plaintiffs.

### b.   Whether Defendants' Conduct was Government Speech

Defendants argue that even if their conduct would otherwise amount to unconstitutional

viewpoint discrimination, their licensing practices are immune from First Amendment scrutiny

under the government speech doctrine, citing Walker, 135 S. Ct. at 2245; accord Pleasant Grove

City v. Summum, 555 U.S. 460, 467-68 (2009); Johanns v. Livestock Mktg. Assn., 554 U.S.

550, 554, 566-67 (2005).  Under the government speech doctrine, the government may constitu-

tionally discriminate among political viewpoints when expressing its own policies, directives,

and preferred views.  See Walker, 135 S. Ct. at 2246 ("[W]hen the government speaks it is

entitled to promote a program, to espouse a policy, or to take a position.").  The government is

afforded this immunity from First Amendment criticism because "'it is not easy to imagine how

government could function if it lacked th[e] freedom' to select the messages it wishes to con-

vey."  Walker, 135 S. Ct. at 2245 (quoting Summum, 555 U.S. at 468).

In <u>Walker</u>, the Supreme Court determined that specialty license plates issued by the State of Texas were government speech, and that the State's denial of a Confederate Flag plate was therefore not subject to First Amendment scrutiny.  <u>Walker</u>, 135 S. Ct. at 2244-45.  In so holding, the <u>Walker</u> Court cited its prior decision in <u>Pleasant Grove City v. Summum</u>, 555 U.S. at 470-73, where the Court concluded that permanent monuments privately donated for display in the city park constituted government speech, and therefore the government did not violate the First Amendment by selectively accepting those monuments.  Applying the government speech test set forth in <u>Summum</u>, the <u>Walker</u> Court concluded that because (1) the States have historically used license plates to communicate with the public, (2) license plates are often closely identified in the public mind with the State, and (3) Texas effectively controlled the expressive content of the license plates by exercising final approval authority over submitted designs, Texas' specialty plates "are similar enough to the monuments in <u>Summum</u> to call for the same result."  <u>Walker</u>, 135 S. Ct. at 2249.  <u>Walker</u> acknowledged that its holding applied only in limited circumstances, however, noting the unusually close connection between license plates and State directives.  <u>Id.</u> at 2251.  <u>Walker</u> held that license plates are government speech because they are government articles serving governmental purposes of vehicle registration and identification, are required by law for every Texas vehicle owner, are issued by the State, and are, "essentially, government IDs."  <u>Id.</u> at 2249.

Defendants have not cited to any cases applying the government speech doctrine in the context of a university licensing program, nor have they cited any cases discussing government speech by a college or university.  To the contrary, a number of other significant First Amendment cases instruct that speech by collegiate student organizations facilitated by a state university is not government speech.  <u>See</u> <u>Bd. of Regents of Univ. of Wis. Sys v. Southworth</u>, 529 U.S. 217, 229 (2000) (holding that a mandatory activity fee to fund student dialogue does not violate

the First Amendment and noting as relevant that the University of Wisconsin had disclaimed that the student speech was its own); Rosenberger, 515 U.S. at 834 ("The distinction between the University's own favored message and the private speech of students is evident in the case before us.").

Nonetheless, Defendants argue the Walker factors are satisfied here.  First, Defendants assert that ISU speaks to the public with its trademarks in that it uses the trademarks to promote the ISU brand, which it uses to attract prospective students, garner public and private funding, and recruit employees.  To support their contention that trademarks are fundamentally expressive tools for their owners, Defendants cite a number of trademark cases including Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 316 U.S. 203, 205 (1942) ("The protection of trade-marks is the law's recognition of the psychological function of symbols."), and Delaware & Hudson Canal Co. v. Stark, 80 U.S. 311, 322 (1873) ("The office of a trade-mark is to point out distinctively the origin, or ownership of the article to which it is affixed; or, in other words, to give notice who was the producer.").  Second, Defendants argue that observers believe ISU licenses its marks to convey its preferred views, contending that backlash to the Article evinces public attribution of NORML ISU's advocacy to ISU itself.  Finally, Defendants argue that the last criterion of the Walker test is satisfied because ISU has effectively controlled its trademark licensing program by its exercise of final approval authority.[3]

---

[3] Defendants also cite a number of compelled speech cases, in which the government sought to require expressive conduct by individual citizens. E.g., Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Grp. of Bos., 515 U.S. 557, 572-74 (1995); Wooley v. Maynard, 430 U.S. 705, 714 (1977); W. Va. Bd. of Educ. v. Barnette, 319 U.S. 624, 637 (1943).  These cases are not relevant, however, because if the Court were to conclude that ISU's trademark licensing program is government speech *at all*, let alone compelled government speech, then Defendants are not subject to scrutiny for viewpoint discrimination to begin with.

After fully considering Defendants' arguments, the Court cannot conclude that ISU's trademark regime, used with permission by hundreds of varied student groups, qualifies for the unique and narrow status of the public monuments at issue in <u>Summum</u> or the license plates in <u>Walker</u>.  Notably, the record is replete with statements by Defendants that they did not intend to communicate any message to the public by licensing ISU trademarks to student groups.  <u>E.g.</u>, Hill Tr. 33:25-34:14, P. App. 249-250 (Q. "The fact that approval for the use of a mark has been given says nothing about whether or not ISU supports the position of that organization, does it?" A. "That's correct."); Madden Tr. 53:14-22, P. App. 101 (Q. "So the fact that the University allows the use of marks or logos does not indicate endorsement of a student organization; is that right?" A. "That is correct."); Pls. Dep. Ex. 67, J. App. 105-107 ("[Receiving a trademark license] does not mean that [ISU] take[s] a position on what any of the organizations represent.").  Far from using its student group licensing program to communicate with the public, ISU remains staunchly neutral as to the professed views of its student groups, and exercises its power to deny licenses only when certain minimum standards of acceptability are not met (e.g., use of the marks on toilet paper and diapers).  The Trademark Office's history of design approvals further demonstrates ISU does not license its trademarks to student groups to announce its political views, because the office has approved designs for an inchoate set of interest groups that are in one instance pro-life, then pro-BDSM, then pro-LGBTA, pro-Democrat, and pro-Republican.  <u>See</u> ISU Trademark Exhibits – Pls.' Mot. Summ. Jgt. App. 48-87, ECF No. 47-3. The Trademark Office's past practice thus makes clear that ISU does not grant licenses to political groups as a means of endorsing or expressing a particular view.

To be sure, and as the cited trademark cases suggest, trademarks are frequently used to associate a product or image with the mark's owner.  Unremarkably, ISU's images are associated

in the public mind with ISU as an institution, which is why Furleigh wanted to include ISU marks on her group's apparel.  Furleigh Dep. 65:19-66:4 – D. App. 441, ECF No. 48-10 ("Because I think people will – you know, you see Cy and you think Iowa State.  It's not just NORML, it's Iowa State . . . .").  Yet to determine whether, in this case, the grant of a trademark license to a student group is intended as government speech, or whether the public would under-stand a student group's use of an ISU trademark as government speech, the Court must view ISU's trademark licensing program against the backdrop of America's educational culture and traditions.  As the Supreme Court noted in <u>Rosenberger</u>, American society regards its college and university campuses as "one of the vital centers for the Nation's intellectual life." <u>Rosenberger</u>, 515 U.S. at 836.  In the public university context, "the State acts against a back-ground and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition."  <u>Id.</u>  In affording special First Amendment safeguards on university campuses, the Supreme Court has often noted "this Nation's dedication to safeguarding academic freedom," <u>Healy</u>, 408 U.S. 180-181, and has remarked that "[t]he essentiality of freedom in the community of American universities is almost self-evident," <u>Sweezy v. New Hampshire by Wyman</u>, 354 U.S. 234, 250 (1957).  In line with the university's traditional station in American society, when ISU licenses its trademarks to a multitude of student groups, the trademarks do not suggest ISU endorses any particular group's political views; rather, the use of the marks by a diverse and often intellectually opposed set of groups reflects the University's rightful commitment to fostering diverse forms of civic engagement and intellectual exploration and debate.  Defendants' argument that ISU's licensed marks express the views of ISU itself runs counter to these traditions.  Nonetheless, Defendants argue that as a matter of fact, the public *did* associate NORML ISU's t-shirt design with the government, pointing to responses

from certain public officials and the few responses received from the general public.  On this record, the Court cannot agree that the public believed ISU promoted marijuana law reform, because the record shows almost no reaction to the Article from the general public.

While not dispositive on the matter of government speech, the Court notes that the third element of the Walker test, effective control of the expressive medium, is satisfied here.  In Walker, the Supreme Court held that Texas controlled its specialty license plate program by exercising final approval authority over submitted designs.  Walker, 135 S. Ct. at 2249.  Defendants similarly had final approval authority over any design submitted to the Trademark Office. Taken together, however, the three Walker factors do not support the conclusion that ISU's trademark licensing program was government speech immune from First Amendment scrutiny. Although ISU may use its trademarks to communicate with the public in some contexts, Defendants stated repeatedly that ISU does not intend to state any position, positive or otherwise, when it grants trademark licenses to its student groups.  The Court finds no basis in the law or the facts of this case to conclude that public observers would infer ISU's endorsement.  Because American society regards its universities as incubators for intellectual experiment and exploration, the Court cannot conclude that observers would associate a student group's message, bearing an ISU icon, to represent the views of ISU.  Rather, ISU's myriad student groups are rightfully understood to represent a jumbled mix of interests, views, and opinions, some mainstream and others offensive to conventional sensibilities, in the spirit of intellectual debate. ISU's final approval authority over its licensing program does not outweigh the other considerations in Walker.  For these reasons, when ISU licenses its trademarks to student groups, it is not engaging in government speech.  Contra Mech. v. School Bd. of Palm Beach, Cnty., Fla., __ F.3d __, 2015 WL 96445870 (11th Cir. Nov. 23, 2015) (applying Walker and holding sponsor

banners constituted government speech under the second <u>Walker</u> factor – endorsement – because the banners hung on school property, bore school colors, identified the sponsor as "'Partner in Excellence' with the school," the banners were the school's way of thanking the sponsor for its support; and under the third <u>Walker</u> factor – control – because like the license plates in <u>Walker</u>, the school controlled the design, typeface, color, size, and location of the banners, as well as limiting the information that the banners could contain to the sponsor's name, contact information, and preexisting business logo).

### 2.   Whether Plaintiffs' Rights were "Clearly Established"

Defendants argue that this is a case of first impression as to whether students have a right to access a public university's trademarks, and that the law is therefore not clearly established. Additionally, Defendants argue that because they relied on the advice of counsel in drafting the trademark guidelines, they are entitled to qualified immunity because "[r]eliance on the advice of counsel is a factor to be weighed in assessing whether a public official is entitled to qualified immunity."  <u>Kincade v. City of Blue Springs, Mo.</u>, 64 F.3d 389, 399 (8th Cir. 1995).

Contrary to Defendants' assertion, this case does not present a novel issue of trademark law, but rather presents a familiar issue of whether a university may discriminate among student groups on the basis of viewpoint.  The First Amendment's prohibition on viewpoint discrimination in the university context is well-established, as it "has long been held that college administrators cannot deny benefits to a recognized student group because of [its] viewpoints." <u>Gerlich v. Leath</u>, No. 4:14-cv-00264-JEG, 2015 WL 4097755, at *10 (S.D. Iowa Jan. 6, 2015) (citing <u>Rosenberger</u>, 515 U.S. at 841; <u>Healy</u>, 408 U.S. at 187-88; and <u>Gay & Lesbian Students Ass'n v. Gohn</u>, 850 F.2d 361, 368 (8th Cir. 1988)).  A reasonable person in Defendants' position

would understand that their conduct, aimed at silencing political controversy associated with the group's political views, was unlawful under the circumstances.  Moreover, while not necessary to the qualified immunity analysis, the record shows Defendants were in fact aware that their conduct implicated Plaintiffs' First Amendment rights.

Defendants' conduct is not immunized from First Amendment scrutiny simply because they consulted with counsel.  "[A]n attorney's advice cannot transform . . . patently unlawful activity into objectively reasonable conduct."  Poulakis v. Rogers, 341 F. App'x 523, 532 (11th Cir. 2009) (unpublished).  "While [Defendants]' reliance on counsel's advice may be a factor in the qualified immunity analysis," Nord v. Walsh Cty., 757 F.3d 734, 747 (8th Cir. 2014), "reliance on the advice of counsel alone will not satisfy an official's burden of acting reasonably," Watertown Equip. Co. v. Norwest Bank Watertown, N.A., 830 F.2d 1487, 1495 (8th Cir. 1987).  A Court should give weight to a defendant's reliance on counsel where the defendant faced an "extraordinary" or "perilous" situation that required prompt action.  Watertown Equip. Co., 830 F.2d at 1495 (holding that the objective test for whether a right is clearly established may be supplemented by reference to a defendant's reliance on counsel in extraordinary circumstances, and finding that the defendant had not encountered extraordinary circumstances when it sought a writ of attachment under an unconstitutional attachment statute).  Because a reasonable person would understand that Defendants' actions treaded on Plaintiffs' First Amendment rights of political expression and association, Defendants' reliance on the advice of counsel is not sufficient to invoke qualified immunity in this case.  See Putnam v. Keller, 332 F.3d 541, 545-49 (8th Cir. 2003) (finding that "extraordinary circumstances" for reliance on the advice of counsel were not present in a First Amendment suit against college officials).

For these reasons, the Court concludes that Defendants' trademark licensing program does not constitute government speech, that Defendants are not entitled to qualified immunity on Plaintiffs' viewpoint discrimination claim, and that Plaintiffs' Motion for Summary Judgment as to their viewpoint discrimination claim must be granted. Defendants' Motion for Summary Judgment as to Plaintiffs' viewpoint discrimination claim must correspondingly be denied.

### E.   Unconstitutional Overbreadth

A governmental directive may be held unconstitutional if "it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally overbroad." Members of City Council of L. A. v. Taxpayers for Vincent, 466 U.S. 789, 796 (1984). "The aim of facial overbreadth analysis is to eliminate the deterrent or 'chilling' effect an overbroad law may have on those contemplating conduct protected by the First Amendment." Turchick v. United States, 561 F.2d 719, 721 (8th Cir. 1977) (footnote omitted). A statute may be unconstitutional if it is so over-broad as to "chill[] . . . individual thought and expression," Rosenberger, 515 U.S. at 835, such that it would "effectively preclude or punish the expression of particular views." Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 583 (1998).

A statute may be deemed unconstitutional only if it is "substantially" overbroad "judged in relation to the statute's plainly legitimate sweep." Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973). A finding of substantial overbreadth "requires the court to find 'a realistic danger that the [policies] will significantly compromise recognized First Amendment protections of parties not before the Court.'" N.Y. State Club Ass'n v. City of N.Y., 487 U.S. 1, 11 (1988) (quoting Taxpayers for Vincent, 466 U.S. at 801). A law is not overbroad merely because one can think of a single impermissible application. See New York v. Ferber, 458 U.S. 747, 772 (1982). A court should not lightly employ invalidation for overbreadth. "Facial invalidation is, manifestly,

strong medicine that has been employed by the Court sparingly and only as a last resort."
Finley, 524 U.S. at 580 (citing Broadrick, 413 U.S. at 613).

In analyzing an overbreadth challenge, the Court must first construe the challenged statute
because "it is impossible to determine whether a statute reaches too far without first knowing
what the statute covers." United States v. Williams, 553 U.S. 285, 293 (2008); see also Phelps v.
Powers, 63 F. Supp. 3d 943, 953 (S.D. Iowa 2014) (same). Next, the Court determines whether
the statute, as construed, "criminalizes a substantial amount of protected expressive activity."
Williams, 553 U.S. at 297. If so, the Court must determine "whether the statute is 'readily
susceptible' to a limiting construction which would render it constitutional." Snider v. City of
Cape Girardeau, 752 F.3d 1149, 1158 (8th Cir. 2014) (quoting Virginia v. Am. Booksellers
Ass'n, 484 U.S. 383, 397 (1988)).

Section 6e of the ISU Trademark Guidelines bars a group from using ISU's marks with
any message that promotes "dangerous, illegal or unhealthy products, action or behaviors."
Plaintiffs contend that under the plain language of the policy, the Army ROTC could be barred
from using ISU's marks because military service is dangerous. Similarly, Plaintiffs argue, these
general standards could prevent CUFFS, the ISU Cyclone Stampede Rodeo, AirSoft Club,
Motocross Club, and Rifle and Pistol Club from receiving trademark office approval. Plaintiffs
contend Section 6e's prohibition against promoting "drugs and drug paraphernalia that are illegal
or unhealthful" also is overbroad, because the policy has been used to prohibit speech that advo-
cates for changes to marijuana laws, which is not endorsement of illegal behavior. Plaintiffs also
suggest, somewhat implausibly, that this standard could be used to prevent Grandma Mojo's
Moonshine Revival, an improvisational comedy group, from using University marks.

In response, Defendants contend that the interpretive doctrine of *noscitur a sociis*, "which
counsels that a word is given more precise content by the neighboring words with which it is

associated," properly limits Section 6e.  See Williams, 553 U.S. at 293.   To illustrate their point

that the terms "unhealthful" and "dangerous" are properly limited by "illegal," Defendants point

out that playing football, serving in the United States military, and playing video games, while

perhaps unhealthful or dangerous, are not inherently illegal.  Yet Defendants' example does not

show that *noscitur a sociis* is helpful here, because the fact that an activity is not unhealthful *and*

dangerous *and* illegal does not clarify whether a given activity would be considered unhealthful

*or* dangerous *or* illegal under the guidelines.  Each of the terms "unhealthful," "dangerous," and

"illegal" is sufficiently different from the others that reading them together does not adequately

limit any of them.  Indeed, by listing the three terms rather than just one (e.g., illegal), it appears

Defendants intended to expand the scope of Section 6e by including the additional terms rather

than to limit it.

Despite the apparent breadth of Section 6e, a challenge of unconstitutional overbreadth

faces the substantial barrier of showing that the challenged policies will inhibit the exercise of

First Amendment rights by parties not before the Court.  Because the record does not reveal any

punishments that would effectively "criminalize" submitting a design that is later rejected, the

Court does not find a realistic danger that the guidelines will chill the thought and expression of

third parties.  See Taxpayers for Vincent, 466 U.S. at 801 ("[T]here must be a realistic danger

that the statute itself will significantly compromise recognized First Amendment protections of

parties not before the Court for it to be facially challenged on overbreadth grounds.").  As the

cases cited by Plaintiffs reflect, the paradigmatic cases of unconstitutional overbreadth involve

the possibility of criminal sanctions for engaging in protected speech.  See, e.g., Williams, 553

U.S. at 292 (considering the constitutionality of a criminal child pornography statute).  Clearly,

a statute that criminalizes a substantial amount of speech protected by the First Amendment

poses a grave danger to the free exchange of ideas, but Defendants' actions and policies, while

unconstitutionally discriminatory as applied to Plaintiffs, do not pose so substantial a risk to the rights of third parties as to justify invalidation of the guidelines themselves.  For these reasons, Plaintiffs' Motion for Summary Judgment as to their unconstitutional overbreadth claim must be denied, and Defendants' Motion for Summary Judgment as to that claim must correspondingly be granted.

### F.  Unconstitutional Vagueness

Closely related to the First Amendment overbreadth doctrine is the void-for-vagueness doctrine, which renders unconstitutional a state regulation whose sweep is so uncertain that citizens forgo protected speech to steer clear of punishment.  "A statute can be impermissibly vague for either of two independent reasons.  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement."  Hill v. Colorado, 530 U.S. 703, 732 (2000) (citing Chicago v. Morales, 527 U.S. 41, 56-57 (2000)).  As the Supreme Court has said,

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.  Vague laws may trap the innocent by not providing fair warning.  Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.  A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms.

Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972) (footnotes omitted).  "[S]tandards of permissible statutory vagueness are strict in the area of free expression."  NAACP v. Button, 371 U.S. 415, 438 (1963).  As with overbreadth challenges, a vagueness challenge must show that the statute at issue has a deterrent effect on legitimate expression that is both real and substantial

and that the statute is not readily subject to a narrowing construction.  Young v. Am. Mini

Theatres, Inc., 427 U.S. 50, 60 (1976).  "What renders a statute vague is not the possibility that it

will sometimes be difficult to determine whether the incriminating fact it establishes has been

proved; but rather the indeterminacy of precisely what that fact is."  Williams, 553 U.S. at 306.

"The degree of vagueness that the Constitution tolerates – as well as the relative impor-

tance of fair notice and fair enforcement – depends in part on the nature of the enactment."  Vill.

of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982).  Courts look to

the nature of prescribed penalties to determine if a given degree of vagueness is tolerable.  See

Reno v. ACLU, 521 U.S. 844, 873 (1997) ("The severity of criminal sanctions may well cause

speakers to remain silent rather than communicate even arguably unlawful words, ideas, and

images.  As a practical matter, this increased deterrent effect, coupled with the 'risk of discrim-

inatory enforcement' of vague regulations, poses greater First Amendment concerns than those

implicated by the civil regulation reviewed in Denver Area Ed. Telecommunications Cons-

ortium, Inc. v. FCC, [518 U.S. 727] (1996)."); Flipside, 455 U.S. at 498-99 ("The Court has also

expressed greater tolerance of enactments with civil rather than criminal penalties because the

consequences of imprecision are qualitatively less severe." (footnote omitted)); Finley, 524 U.S.

at 588 ("It is unlikely . . . that speakers will be compelled to steer too far clear of any 'forbidden

area' in the context of grants [for the arts].").

Plaintiffs argue Section 6e is impermissibly vague because it includes no criteria for

students to understand what ISU officials might consider "dangerous" or "unhealthful."  In

support of their assertion, Plaintiffs point to Defendants' history of trademark authorizations,

which do not follow a coherent pattern of approvals and denials for ostensibly "dangerous" or

"unhealthful" activities.  ISU has authorized its marks to be used by ISU CUFFS, the ISU Rodeo

41

Club, the Boxing Club, and Iowa State Men's and Women's Rugby Clubs, any of which, in Plaintiffs' view, could be seen as promoting "dangerous" or "unhealthful" activities under the trademark guidelines. Based on the guidelines' text and the history of their application, Plaintiffs argue, a person of normal intelligence cannot know what conduct is or is not acceptable under the guidelines.

Defendants do not entirely dispute the vagueness of Section 6e, claiming primarily that the word "promote" is not unconstitutionally vague. See McConnell v. Fed. Election Comm'n, 540 U.S. 93, 170 n.64 (2003), overruled on other grounds by Citizens United v. Fed. Election Comm'n, 558 U.S. 310 (2010). Instead, Defendants dispute whether invalidation of the guidelines is appropriate given that there are no sanctions associated with them.

Once again, the purpose of facial challenges for overbreadth and vagueness is to prevent any chilling effect that imprecise or overly inclusive rules may have on the exercise of protected speech by non-parties. Taxpayers for Vincent, 466 U.S. at 801. The Court cannot conclude there is any material risk of chilled speech connected with Defendants' revised trademark guidelines given that there are no penalties for submitting a design that is ultimately rejected; student groups are free to submit any designs they wish. Because the Court is unable to find any risk of chilled speech for parties not before the Court, the trademark guidelines at issue in this case are not unconstitutionally vague. Therefore, Plaintiffs' Motion for Summary Judgment as to their unconstitutional vagueness claim must be denied, and Defendants' Motion for Summary Judgment as to that claim must correspondingly be granted.

### G. Remedy

In crafting an appropriate remedy, the Court seeks to go no further than necessary to address the constitutional wrong supported by this record. See Rogers v. Scurr, 676 F.2d 1211,

1214 (8th Cir. 1982) ("An injunction must be tailored to remedy specific harm shown."); see also Coca-Cola Co. v. Purdy, 382 F.3d 774, 790 (8th Cir. 2004) ("Provisions of an injunction may be set aside if they are broader than necessary to remedy the underlying wrong.").  Therefore, the Court fashions a remedy that addresses the specific conduct of the Defendants that adversely impacted these Plaintiffs: the withdrawal of permission to use university logos; the denial of permission to reorder T-Shirt Design #1; and denials of designs of essentially the same character. While the Court does not find the new guidelines to be constitutionally infirm on their face, the Court must find that those new guidelines were promulgated in response to the conduct of these Plaintiffs and were used to limit Plaintiffs' expression that did not offend the guidelines, causing the guidelines to fail as applied.

Consideration of a permanent injunction involves essentially the same factors as for a preliminary injunction.  Compare Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc) with Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church, 634 F.3d 1005, 1012 (8th Cir. 2011).  The primary distinction is a permanent injunction requires a showing of actual rather than probable success on the merits. Bank One v. Guttau, 190 F.3d 844, 847 (8th Cir. 1999).  Accordingly, the Court considers the familiar four factors: (1) whether the movant has demonstrated success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance that harm and any injury the relief would inflict on the opposing parties; and (4) whether the injunction will serve the public interest.  Dataphase, 640 F.2d at 114.  Plaintiffs have demonstrated actual success on the merits. "The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury."  Powell v. Noble, 798 F.3d 690, 702 (8th Cir. 2015) (quoting Elrod v. Burns, 427 U.S. 347 (1976).  The relief herein is appropriately limited and places no

undue burden on the Defendants in a scheme that allows for a wide range of uses of university

marks.  Lastly, it is axiomatic that protection of First Amendment rights serves the public

interest.  See Minn. Citizens Concerned for Life, Inc. v. Swanson, 692 F.3d 864, 870 (8th Cir.

2012) (en banc) ("When a plaintiff has shown a likely violation of his or her First Amendment

rights, the other requirements for obtaining a preliminary injunction are generally deemed to

have been satisfied."). Therefore, the Court finds properly limited injunctive relief is fully

supported by this record.

## III.   CONCLUSION

For the reasons stated, the cross-Motions for Summary Judgment, ECF No. 47 and ECF

No. 48, must be granted in part and denied in part.  Plaintiffs' Motion for Summary Judgment,

ECF No. 47, must be **granted** under Rule 56 as to Count I of Plaintiffs' Complaint, ECF No. 1,

for as-applied violation of Plaintiffs' right to free speech and political expression under the First

and Fourteenth Amendments with respect to Plaintiffs' ability to produce and reorder T-Shirt

Design #1 and to produce other licensed apparel including a similar image of a cannabis leaf

under ISU's revised trademark guidelines.  Defendants' Motion for Summary Judgment, ECF

No. 48, must correspondingly be **denied** as to Count I of Plaintiffs' Complaint.  Also for the

reasons stated, Plaintiffs' Motion for Summary Judgment as to Counts II and III of Plaintiffs'

Complaint must be **denied**, and Defendants' Motion for Summary Judgment as to Counts II and

III must correspondingly be **granted**.

Defendants are hereby permanently enjoined from enforcing trademark licensing policies

against Plaintiffs in a viewpoint discriminatory manner and from further prohibiting Plaintiffs

from producing licensed apparel on the basis that their designs include the image of a similar cannabis leaf.

Plaintiffs are directed to submit to the Court their claims for fees, costs, and expenses in accordance with 42 U.S.C. § 1988 and other applicable law.

**IT IS SO ORDERED**.

Dated this 22nd day of January, 2016.

JAMES E. GRITZNER, Senior Judge
U.S. DISTRICT COURT