# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 16-1518

———————————————

Paul Gerlich; Erin Furleigh

*Plaintiffs - Appellees*

v.

Steven Leath; Warren Madden; Thomas Hill; Leesha Zimmerman

*Defendants - Appellants*

------------------------------

Student Press Law Center; Ratio Christi; Students for Life of America; Christian Legal Society; Young America's Foundation; Young Americans for Liberty

*Amici on Behalf of Appellee(s)*

——————————

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

——————————

Submitted: December 14, 2016
Filed:

——————————

Before LOKEN, MURPHY, and KELLY, Circuit Judges.

——————————

MURPHY, Circuit Judge.

Iowa State University (ISU) grants student organizations permission to use its trademarks if certain conditions are met. The ISU student chapter of the National Organization for the Reform of Marijuana Laws (NORML ISU) had several of its trademark licensing requests denied because its designs included a cannabis leaf. Two members of the student group subsequently filed this 42 U.S.C. § 1983 action, alleging various violations of their First and Fourteenth Amendment rights. The district court[1] granted plaintiffs' summary judgment motion in part and entered a permanent injunction against defendants. Defendants appeal, and we affirm.

## I.

ISU is a land grant university that has an enrollment of over 36,000 students and approximately 800 officially recognized student organizations. Student groups often create merchandise that contains the group's name and ISU insignia to generate awareness about the group's cause or attract members. Student groups may use ISU's trademarks on merchandise if ISU's Trademark Licensing Office (Trademark Office) determines that the use complies with ISU's Guidelines for University Trademark Use by Student and Campus Organizations (Trademark Guidelines). ISU's trademarks include word marks like "ISU" and "Iowa State," as well as logos, such as the school's mascot (Cy the Cardinal). At all relevant times, Leesha Zimmerman was the director of ISU's Trademark Office and reported to Warren Madden, Senior Vice President of the Division of Business & Financial Affairs.

NORML ISU is an officially recognized student organization at ISU. It is a student chapter of the national NORML organization and its purpose is to reform federal and state marijuana laws. The group was refounded in 2012. In October 2012, NORML ISU submitted a t-shirt design (T-Shirt Design #1) to the Trademark Office

---

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa.

that had "NORML ISU" on the front with the "O" represented by Cy the Cardinal.  On the back the shirt read, "Freedom is NORML at ISU" with a small cannabis leaf above "NORML."  The Trademark Office approved T-Shirt Design #1.

On November 19, 2012, the Des Moines Register published a front page article about the marijuana legalization referenda in Colorado and Washington and pending legislative efforts in Iowa to legalize recreational and medicinal marijuana.  The article quoted NORML ISU President Josh Montgomery regarding the group's political efforts to change Iowa's marijuana laws.  The article then stated "Montgomery said his group has gotten nothing but support from the university.  He even got approval from the licensing office to make a NORML T-shirt with the ISU logo; the red shirt features Cy the Cardinal on the front, and a pot leaf on the back . . . ."  The article also contained a photograph of the front and back of T-Shirt Design #1.

At 8:50 AM on November 19, Zimmerman provided ISU's public relations office with the following statement regarding the article:

> The university's Trademark Policy and Student Use Guidelines allow officially recognized student organizations the ability to use Iowa State's trademarks as long as they observe the proper procedures and follow specified design standards. Groups, including NORML, may use any of the university's indicia (names, graphics, logos, etc.) as long as they seek review and approval from the Trademark Licensing Office, which they did for the T-shirts. This does not mean that we take a position on what any of the organizations represent. We have 800 groups from The ISU Line Dancer's [sic], CUFFS, the ISU Baseball Club, LGBTAA, John Paul Jones Society, Game Renegades, ROTC, and many more. I believe that the statement in the article indicating "his group has gotten nothing but support from the university" is a bit misleading. He may be confusing recognition of the group as the university "supporting" it.

-3-

Later that morning, an Iowa House Republican caucus staff person sent a formal legislative inquiry to ISU's State Relations Officer asking whether "ISU's licensing office approve[d] the use of the ISU logo on the NORML t-shirt" pictured in the article. This request was forwarded to ISU President Steven Leath and his chief of staff, Miles Lackey, at 1:08 PM.

At 2:00 PM Madden told Thomas Hill, Senior Vice President for Student Affairs, Zimmerman, and other ISU administrators that Lackey indicated that ISU was "getting some push back regarding the Register article," and that "[h]e wants to place this on" the president's cabinet meeting discussion agenda. Leath later testified that "the reason it was on the agenda is because we were getting pushback. If nobody'd ever said anything, we didn't know about it, it didn't appear in The Register, we'd probably never raised the issue."

At 3:00 PM Leath emailed Lackey to ask whether ISU could "revoke" the approval of T-Shirt Design #1 "without more damage." Leath explained this email at his deposition by stating "[i]f we gave approval to something that was inappropriate, we might want to consider revoking it, but we could just make the problem worse, and I was asking for his advice."

At 3:19 PM Leath stated in an email to Madden "[w]e need to deal with this. . . . What were they thinking?" Leath explained at his deposition that because T-Shirt Design #1 "had some political public relations implications," someone should have "run it up the chain" because "there are some issues that are clearly going to cause controversy and it's better to manage them on the front end." Leath also testified that "my experience would say in a state as conservative as Iowa on many issues, that" T-Shirt Design #1 "was going to be a problem."

On November 20, Dale Wollery of the Governor's Office of Drug Control Policy emailed and called the head of ISU's government relations office about the

-4-

article. Wollery's email indicated that he was "curious about the accuracy of the student's statement cited in the report, and perhaps the process used by ISU to make such determinations." Wollery's concerns were shared with Zimmerman, Lackey, and Leath on November 21. Leath testified at his deposition that "anytime someone from the governor's staff calls complaining, yeah, I'm going to pay attention, absolutely." Leath further elaborated, "we are a state entity and he's the chief executive of the state, and so directly or indirectly we're responsible to the governor."

On November 21, the head of ISU's public relations office responded to Wollery's messages by stating that NORML ISU's use of ISU's trademarks was "permitted under the policies governing student organizations." The email went on to say, "[h]owever, this procedure is being reviewed."

On November 24, NORML ISU requested permission from ISU's Trademark Office to use T-Shirt Design #1 for another order. Madden decided to place this reorder on hold until after the president's cabinet meeting. Madden testified that he did not order the Trademark Office to hold reorder approvals for any other campus group. Zimmerman testified that she could not think of any other time that the Trademark Office had placed a student group request on hold. The president's cabinet meeting took place on November 26. After discussing the Des Moines Register article and NORML ISU's reorder request, the group agreed that ISU's Trademark Guidelines had to be changed.

Madden and Hill met with members of NORML ISU on November 29. Madden and Hill referenced the Des Moines Register article and expressed concern that the group's use of ISU's trademarks on T-Shirt Design #1 caused confusion as to whether ISU endorsed the group's views regarding the legalization of marijuana. They then informed the group that the Trademark Office would not approve of any t-shirt design that used ISU trademarks in conjunction with a cannabis leaf. They also told the group that it was required to obtain approval for any future designs from Madden

-5-

and Hill prior to submitting the designs to the Trademark Office.  Zimmerman testified that to her knowledge this was the first time ISU had imposed a prior review procedure to a student group's trademark design application process.

NORML ISU's reorder of T-Shirt Design #1 was rejected by ISU's Trademark Office on December 3.  On January 16, 2013 the Trademark Guidelines were revised. The new Trademark Guidelines prohibited "designs that suggest promotion of the below listed items . . . dangerous, illegal or unhealthy products, actions or behaviors; . . . [or] drugs and drug paraphernalia that are illegal or unhealthful."  Madden indicated that this revision to the Trademark Guidelines "was done as the result of a number of external comments including interpretations that the t-shirt developed indicated that Iowa State University supported the NORMAL [sic] ISU advocacy for the reform of marijuana laws."

After the Trademark Guidelines were revised, the Trademark Office rejected every NORML ISU design application that included the image of a cannabis leaf.  The Trademark Office also rejected designs that spelled out the NORML acronym but replaced "Marijuana" with either "M********" or "M[CENSORED]."  The Trademark Office however approved several designs which did not use a cannabis leaf, but simply stated the group's name, and fully spelled out the NORML acronym.

In July 2014 Paul Gerlich and Erin Furleigh filed this action against Leath, Madden, Hill, and Zimmerman stating claims under 42 U.S.C. § 1983 for alleged violations of their First and Fourteenth Amendment rights.  At the time the complaint was filed, Gerlich was the president of NORML ISU and Furleigh was the group's vice president.  Count I alleged that defendants' trademark licensing decisions, as applied to plaintiffs, violated their right to free speech.  Counts II through IV alleged that the trademark guidelines were unconstitutional on their face and unconstitutionally vague.  The district court granted plaintiffs' motion for summary judgment on Count I, but dismissed Counts II through IV.  The district court also

entered a permanent injunction that prohibits defendants "from enforcing trademark licensing policies against Plaintiffs in a viewpoint discriminatory manner and from further prohibiting Plaintiffs from producing licensed apparel on the basis that their designs include the image of a . . . cannabis leaf."

## II.

Defendants argue that the district court improperly concluded that plaintiffs have standing to bring this action.  We review de novo "the district court's conclusion that the plaintiffs had standing." Jones v. Gale, 470 F.3d 1261, 1265 (8th Cir. 2006). Standing is a "jurisdictional prerequisite that must be resolved before reaching the merits of a suit." Hodak v. City of St. Peters, 535 F.3d 899, 903 (8th Cir. 2008) (quoting Medalie v. Bayer Corp., 510 F.3d 828, 829 (8th Cir. 2007)).  Under Article III of the Constitution, a plaintiff must demonstrate three elements to establish standing: "(1) injury in fact, (2) a causal connection between that injury and the challenged conduct, and (3) the likelihood that a favorable decision by the court will redress the alleged injury." Young Am. Corp. v. Affiliated Computer Servs. (ACS), Inc., 424 F.3d 840, 843 (8th Cir. 2005).  Plaintiffs bear the burden of proving these elements.  See id.

Defendants argue that plaintiffs lack an injury in fact because plaintiffs are asserting NORML ISU's right to free speech, not their own.  To establish an injury in fact, a party must "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 472 (1982).  An injury is defined under 42 U.S.C. § 1983 as a "deprivation of any rights, privileges, or immunities secured by the Constitution and laws."

We conclude that plaintiffs suffered an injury in fact in their individual capacities, and that they therefore have standing to bring this action.  Plaintiffs'

-7-

attempts to obtain approval to use ISU's trademarks on NORML ISU's merchandise amounted to constitutionally protected speech.  See, e.g., Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 828–37 (1995).  Plaintiffs' allegations that ISU violated their First Amendment rights by rejecting their designs and therefore preventing their ability to spread NORML ISU's message are sufficient to establish an injury in fact.  Moreover,  in both Widmar v. Vincent, 454 U.S. 263 (1981), and Rosenberger, 515 U.S. 819, individual students sued universities on behalf of their student organizations and the Supreme Court did not conclude that it lacked subject matter jurisdiction over the students' actions.  We therefore conclude that plaintiffs have standing to bring this action.

### III.

Defendants next argue that the district court erred by granting plaintiffs summary judgment on their as applied First Amendment claim.  We review a district court's "grant of summary judgment de novo and consider the facts in the light most favorable to the nonmoving party." Nichols v. Tri-Nat'l Logistics, Inc., 809 F.3d 981, 985 (8th Cir. 2016).   A district court's grant of "[s]ummary judgment is only appropriate when 'there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.'" Id. (quoting Pinson v. 45 Dev., LLC, 758 F.3d 948, 951–52 (8th Cir. 2014)).

### A.

We first must determine whether the district court properly applied the qualified immunity doctrine to this dispute.  "Qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Mountain Pure, LLC v. Roberts, 814 F.3d 928, 932 (8th Cir. 2016) (quoting Coates v. Powell, 639 F.3d 471, 476 (8th Cir. 2011)).  Qualified immunity does not apply

to claims for injunctive relief, however.  Mead v. Palmer, 794 F.3d 932, 937 (8th Cir. 2015).  Qualified immunity is not an issue here because this appeal solely concerns plaintiffs' request for injunctive relief.

B.

Next, we must determine whether defendants violated plaintiffs' First Amendment rights.  If a state university creates a limited public forum for speech, it may not "discriminate against speech on the basis of its viewpoint."  Rosenberger, 515 U.S. at 829.  A university "establish[es] limited public forums by opening property limited to use by certain groups or dedicated solely to the discussion of certain subjects."  Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez, 561 U.S. 661, 679 n.11 (2010) (internal quotation marks and citation omitted).  A university's student activity fund is an example of a limited public forum.  See Rosenberger, 515 U.S. at 823–27, 829–30.  ISU created a limited public forum when it made its trademarks available for student organizations to use if they abided by certain conditions.

The defendants' rejection of NORML ISU's designs discriminated against that group on the basis of the group's viewpoint.  The state engages in viewpoint discrimination when the rationale for its regulation of speech is "the specific motivating ideology or the opinion or perspective of the speaker."  Rosenberger, 515 U.S. at 829.  Every viewpoint discrimination claim "requires, by its very nature, that the purposes or motives of governmental officials be determined."  Gay & Lesbian Students Ass'n v. Gohn, 850 F.2d 361, 367 (8th Cir. 1988).  Viewpoint discrimination "can be justified only if the government demonstrates that its regulation is narrowly drawn and is necessary to effectuate a compelling state interest."  Id. at 366.

The defendants' discriminatory motive is evidenced by the unique scrutiny defendants imposed on NORML ISU after the Des Moines Register article was published.  For example, after the article had been published, defendants placed NORML ISU's reorder of T-Shirt Design #1 on hold despite the fact that the

-9-

Trademark Office had already approved the design.  Defendants claim that the hold on NORML ISU's reorder request was not specific to that group because they also placed on hold a trademark request for a plaque made by the Association of Malaysian Students.  Zimmerman indicated in an email, however, that if that group were to tell administrators when it needed the plaque, the Trademark Office "may be able to move that review forward."  ISU did not offer NORML ISU similar flexibility.  Moreover, Zimmerman testified that she could not recall ever placing another student group's reorder request on hold, and Madden testified that he did not order the Trademark Office to hold reorder requests from any other student group.

Another example of the unique scrutiny imposed on NORML ISU is that the group was required to obtain approval  from Madden and Hill for any future designs using ISU trademarks prior to submitting the designs to the Trademark Office. Zimmerman testified that to her knowledge this was the first time ISU had imposed such a prior review procedure.  Defendants argue that this type of scrutiny was not unique to NORML ISU because the hockey club was also subject to additional oversight over its trademark applications.  The university had imposed additional scrutiny on the hockey club because the club mismanaged funds and misrepresented itself as an intercollegiate sport, however.  NORML ISU had not engaged in similar malfeasance.  Moreover, the hockey club was not required to receive preapproval of its designs by two ISU senior vice presidents.

A third example of the unique scrutiny NORML ISU received is that NORML ISU is the only ISU student group to have had its trademark application denied for fear that the university would be endorsing a political cause.  Defendants point to  six examples of design requests that were rejected to avoid the appearance of an endorsement.  All of these examples are inapposite, however.  Four of the designs were rejected because it appeared ISU was endorsing a corporate logo.  Another design was rejected because it suggested that a club sport was an official athletic department sport.  The final design was rejected because it appeared that ISU was

-10-

endorsing the views of the Students for Life club, but the Trademark Office approved the design after the group made one minor change to the design.

Defendants' actions and statements show that the unique scrutiny they imposed on NORML ISU's trademark applications was motivated by viewpoint discrimination. After the <u>Des Moines Register</u> article was published, ISU stated that any student group could use the university trademarks "as long as they observe the proper procedures and follow specified design standards." ISU further stated that "[t]his does not mean that we take a position on what any of the organizations represent." After the governor's office and an Iowa House Republican Caucus staff person contacted ISU regarding the article, however, defendants immediately took measures to contain the political controversy by revising its Trademark Guidelines and imposing unique scrutiny upon NORML ISU's trademark application process.

Defendants argue that the political pushback that they received regarding T-Shirt Design #1 did not play a role in their decision making. This argument ignores significant evidence to the contrary. For example, Leath testified that "anytime someone from the governor's staff calls complaining, yeah, I'm going to pay attention, absolutely." Leath also testified that the reason the Trademark Policy was on the president's cabinet meeting agenda which took place five days after the <u>Des Moines Register</u> article was published was "because we were getting pushback." Leath went on to testify that "[i]f nobody'd ever said anything, we didn't know about it, it didn't appear in The Register, we'd probably never raised the issue."

The record is also replete with statements from defendants regarding their political motives. Leath explained at his deposition that because T-Shirt Design #1 "had some political public relations implications," someone should have "run it up the chain" because "there are some issues that are clearly going to cause controversy and it's better to manage them on the front end." He also testified that "in a state as conservative as Iowa on many issues, . . . it was going to be a problem." Hill stated

-11-

in an interview with the <u>Ames Tribune</u> that the reason student groups associated with political parties could use ISU's logos, but groups like NORML ISU may not, is because "[w]e encourage students to be involved in their duties as a citizen."  Such a statement implies that Hill believed that the members of NORML ISU were not undertaking their duties as citizens by advocating for a change in the law.

Zimmerman stated in an email to NORML ISU's faculty advisor in May 2013 that the group's design that included the statement "Legalize Marijuana" was rejected because "'Legalize Marijuana' is a call to action but it does not suggest any specific way your organization is making that happen."  Zimmerman went on to say that the group's design applications "appear to have a certain shock or attention grabbing sensationalism."  Zimmerman further stated that her "interpretation is that these do not further your cause as an advocate for change in the laws or trying to change the public's perception of marijuana."  There is no evidence in the record of Zimmerman offering advocacy advice to any other student group.

Finally, Madden indicated that the Trademark Guidelines were revised "as the result of a number of external comments including interpretations that the t-shirt developed indicated that Iowa State University supported the NORMAL [sic] ISU advocacy for the reform of marijuana laws."  As noted above, however, the Trademark Office had never before rejected a student group's design application due to confusion over endorsement of the group's cause.  Moreover, defendants consistently stated throughout the record that a student organization's use of ISU marks does not indicate university approval of that group's beliefs.

The instant facts are somewhat similar to those in <u>Gay & Lesbian Students Ass'n v. Gohn</u>, 850 F.2d 361 (8th Cir. 1988).  In that case, the University of Arkansas made funding available to student groups but denied funding one advocating for gay and lesbian rights.  <u>Id.</u> at 362–65.  We concluded that the university had engaged in viewpoint discrimination.  <u>Id.</u> at 367.  In reaching this conclusion our court relied on

-12-

the fact that the university followed an unusual funding procedure that was specific to the gay and lesbian group, some of the decision makers "freely admitted that they voted against the group because of its views," and "[u]iversity officials were feeling pressure from state legislators not to fund" the group.  Id.

Similar to the university in Gohn, ISU followed an unusual trademark approval process with respect to all of NORML ISU's trademark design applications after the Des Moines Register article was published.  Moreover, defendants at least implied that the additional scrutiny imposed on NORML ISU was due to the views for which it was advocating.  Finally, defendants were motivated at least in part by pressure from Iowa politicians.

The district court did not err by concluding that defendants violated plaintiffs' First Amendment rights because defendants engaged in viewpoint discrimination and did not argue that their administration of the trademark licensing program was narrowly tailored to satisfy a compelling governmental interest.

## C.

Defendants argue that even if they did engage in viewpoint discrimination, they did not violate plaintiffs' First Amendment rights because the administration of the trademark licensing regime should be considered government speech.  The "Free Speech Clause restricts government regulation of private speech" but "it does not regulate government speech."  Roach v. Stouffer, 560 F.3d 860, 863 (8th Cir. 2009) (quoting Pleasant Grove City v. Summum, 555 U.S. 460, 467 (2009)).  When the "government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."  Walker v. Tex. Div., Sons of Confederate Veterans, Inc., 135 S. Ct. 2239, 2245 (2015).

-13-

The government speech doctrine does not apply if a government entity has created a limited public forum for speech. <u>Pleasant Grove City</u>, 555 U.S. at 470, 478–80. As noted above, ISU created a limited public forum when it made its trademarks available for student organizations to use if they abided by certain conditions. The administration of its trademark licensing regime therefore did not constitute government speech.

Even if the trademark licensing regime here did not amount to a limited public forum, however, the government speech doctrine still does not apply on this record. The <u>Walker</u> decision considered three factors when determining whether certain speech is government speech. 135 S. Ct. at 2248–49. First, it determined whether the government has long used the particular medium at issue to speak. <u>Id.</u> at 2248. Second, it analyzed whether the medium is "often closely identified in the public mind with the" state. <u>Id.</u> (internal quotation marks omitted). Third, it determined whether the state "maintains direct control over the messages conveyed" through the medium. <u>Id.</u> at 2249.

The first two factors do not apply to the speech at issue in this case. ISU allows approximately 800 student organizations to use its trademarks. Defendants repeatedly stated in their testimony and other record evidence that the university did not intend to communicate any message to the public by licensing ISU trademarks to student groups. Indeed, the university licenses its trademarks to groups that have opposite viewpoints from one another like the Iowa State Democrats and the ISU College Republicans. Even if ISU's trademark licensing regime were to satisfy the final factor, the factors taken together would not support the conclusion that the speech at issue in this case is government speech because ISU does not use its trademark licensing regime to speak to the public.

-14-

IV.

Defendants argue that the injunctive relief granted by the district court is too broad because it grants NORML ISU the ability to use its trademarks in a way that violates its viewpoint neutral trademark guidelines.   We review a challenge to a "district court's issuance of a permanent injunction for abuse of discretion."  Randolph v. Rodgers, 170 F.3d 850, 856 (8th Cir. 1999).  An injunction must not be "broader than necessary to remedy the underlying wrong."  Coca-Cola Co. v. Purdy, 382 F.3d 774, 790 (8th Cir. 2004).  As noted above, NORML ISU's use of the cannabis leaf does not violate ISU's trademark policies because the organization advocates for reform to marijuana laws, not the illegal use of marijuana.  The district court's injunctive order therefore did not abuse its discretion.

V.

For these reasons, we affirm the judgment of the district court.

_____